**Affirmed and Opinion filed January 24, 2012.**



In The

# Fourteenth Court of Appeals

## NO. 14-10-00413-CR

### CHIKE KODILINYE NZEWI, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 176th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1176513**

## O P I N I O N

Appellant, Chike Kodilinye Nzewi, was convicted of the state jail felony offense of tampering with a witness. Appellant contends the evidence is legally insufficient to support his conviction and the trial court abused its discretion by including erroneous language in the jury charge, consolidating his case with another defendant's case, and sustaining the State's objection to appellant's jury argument. We affirm.

### I. BACKGROUND

In July 2007, Emeka Michael Uyamadu was preparing to board an airplane to Nigeria when several undeclared computers were discovered in his luggage. Uyamada

agreed to leave the computers at the airport during his trip and assured officers that his secretary would provide invoices to prove they were purchased. While Uyamada was in Nigeria, officers learned that two of the computers had been stolen in June 2007.

When Uyamada returned, officers interviewed him regarding the computers. Uyamada stated that he purchased the computers at internet auctions during May 2007. He further stated that he had limited computer knowledge, and his friend, appellant, inspects the computers he purchases. Even after officers informed Uyamada that the computers were stolen in June 2007, Uyamada maintained he last purchased computers in May 2007. Appellant told the officers that he stored all of his computers at one of his offices and consented to a search of the office. At first, appellant claimed he did not have a spare key to the office; then, he gave officers a wrong key, and they were unable to enter appellant's office until he provided the correct key.

Uyamada was charged with theft of the computers. Several months later, officers received information that prompted them to initiate a new investigation regarding whether Uyamada and appellant had committed witness tampering. During the investigation, officers discovered that appellant contacted his former girlfriend, Sabrina Belfon, and requested that she "take the charge" of theft for Uyamada in exchange for money. Working with law-enforcement officers, Belfon agreed to wear concealed audio- and video-recording equipment during a May 17, 2008 meeting with appellant and Uyamada. During the meeting, described in detail below, Uyamada told Belfon that she may be required to testify falsely at his trial.

Appellant and Uyamada were indicted for tampering with a witness. The trial court consolidated the witness-tampering charge against appellant and the witness-tampering and theft charges against Uyamada into a single trial. A jury convicted appellant and assessed punishment at two years' confinement.[1]

---

[1] The jury also convicted Uyamada of both charges brought against him. Our court affirmed both judgments against Uyamada. *See Uyamada v. State*, --- S.W.3d. ---, Nos. 14-10-00393-CR, 14-10-00394-CR, 2011 WL 6824973 (Tex. App.—Houston [14th Dist.] Dec. 29, 2011, no pet. h.).

## II. LEGAL SUFFICIENCY

In his first issue, appellant argues that the evidence is legally insufficient to support his conviction for witness tampering.

### A. Applicable Law and Standard of Review

As charged in the indictment, "[a] person commits [the offense of tampering with a witness] if, with intent to influence the witness, he offers, confers, or agrees to confer any benefit on a witness or prospective witness in an official proceeding . . . to testify falsely." Tex. Penal Code Ann. § 36.05(a)(1) (West 2011).

When reviewing sufficiency of the evidence, we view all of the evidence and any reasonable inferences in the light most favorable to the verdict and determine whether any rational fact finder could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)). We do not sit as thirteenth juror and may not substitute our judgment for that of the fact finder by re-evaluating the weight and credibility of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Rather, we defer to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id.* This standard applies equally to circumstantial and direct evidence. *Id.* Our duty as reviewing court is to ensure the evidence presented actually supports a conclusion that the defendant committed the crime. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

Circumstantial evidence is as probative as direct evidence in establishing guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). An inference is a conclusion reached by considering other facts and deducing a logical consequence from them. *Id.* at 16. Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. *Id.* A conclusion reached by speculation may not be completely

unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt. *Id.* Each fact need not point directly and independently to the appellant's guilt, as long as the cumulative effect of all incriminating facts is sufficient to support the conviction. *Id.* at 13.

Sufficiency of the evidence is measured by elements of the offense as defined in a hypothetically correct jury charge, which accurately explains the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

## B. Analysis

### 1. Evidence regarding "prospective witness"

Appellant first argues that no evidence supports a finding that Belfon was a "witness" or "prospective witness" within the meaning of section 36.05. Resolution of this issue requires interpretation of the Penal Code. Statutory interpretation is a question of law we review *de novo*. *Williams v. State*, 253 S.W.3d 673, 677 (Tex. Crim. App. 2008). We construe a statute according to its plain meaning. *Thompson v. State*, 236 S.W.3d 787, 792 (Tex. Crim. App. 2007). In determining the plain meaning of statutory language, "[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage." Tex. Gov't Code Ann. § 311.011(a) (West 2005); *Dowthitt v. State*, 931 S.W.2d 244, 258 (Tex. Crim. App. 1996). If the language of the statute is unambiguous, we may not consider matters beyond the text of the statute in interpreting it. *Thompson*, 236 S.W.3d at 792.

Acknowledging that "witness" and "prospective witness" are not defined in the Penal Code, appellant cites cases in which the Court of Criminal Appeals analyzed these terms as used in the retaliation statute of the Penal Code. *See Cada v. State*, 334 S.W.3d 766, 770–76 (Tex. Crim. App. 2011); *Morrow v. State*, 862 S.W.2d 612, 613–15 (Tex.

4

Crim. App. 1993); *see also* Tex. Penal Code Ann. § 36.06 (West 2011) (retaliation statute). In those cases, the court recognized that "[a] central purpose of the retaliation statute is to encourage a specified class of citizens—which includes public servants, witnesses, prospective witnesses, and informants—to perform vital public duties without fear of retribution." *Cada*, 334 S.W.3d at 771; *see also Morrow*, 862 S.W.2d at 615. Those duties "may include reporting criminal activities, testifying in official proceedings, or cooperating with the government in a criminal investigation." *Cada*, 334 S.W.3d at 771 (quoting *Morrow*, 862 S.W.2d at 615).

Appellant argues that the purpose of the witness-tampering statute is similar—to prevent an individual from tampering with witnesses and prospective witnesses who possess inculpatory information and may be required to testify on behalf of the government. According to appellant, Belfon was not a prospective witness, as the term is used in the witness-tampering statute, because the State did not intend to present her as a witness. In support of this argument, appellant cites a witness-tampering case in which the defendant tampered with one of the State's prospective witnesses. *See Arnold v. State*, 68 S.W.3d 93, 96–101 (Tex. App.—Dallas 2001, pet ref'd) (concluding evidence sufficient to support finding that defendant tampered with prospective State witness; also, citing cases from other jurisdictions involving tampering with government witnesses and government prospective witnesses); *see also Navarro v. State*, 810 S.W.2d 432, 435–36 (Tex. App.—San Antonio 1991, pet. ref'd) (concluding defendant attempted to coerce prospective State witness to testify falsely). Appellant also cites a capital murder case involving retaliation against a State witness. *See Ortiz v. State*, 93 S.W.3d 79, 86–87 (Tex. Crim. App. 2002). However, the fact that courts have applied the witness-tampering statute when the subject was a prospective witness for the State does not preclude application of the statute in situations involving a prospective witness for the defendant. To determine the scope of "witness" and "prospective witness," we construe the terms as used in the statute and according to the rules of grammar and common usage. *See* Tex. Gov't Code Ann. § 311.011(a); *Dowthitt*, 931 S.W.2d at 258.

5

Under section 36.05, a person commits witness tampering by soliciting a witness or prospective witness in an official proceeding "(1) to testify falsely; (2) to withhold any testimony, information, document, or thing; (3) to elude legal process summoning him to testify or supply evidence; (4) to absent himself from an official proceeding to which he has been legally summoned; or (5) to abstain from, discontinue, or delay the prosecution of another." Tex. Penal Code Ann. § 36.05(a). Admittedly, subsections (2) through (5) refer to *preventing* someone from presenting testimony or evidence. In the context of a criminal trial, these subsections would most likely apply to situations in which a person tampered with a State witness. *See, e.g.*, *Arnold*, 68 S.W.3d at 100–01 (defendant intended for prospective State witness to elude legal process); *Nunez v. State*, 27 S.W.3d 210, 218–19 (Tex. App.—El Paso 2000, no pet.) (defendant intended for prospective State witness to "abstain from or discontinue the criminal and disciplinary charges"); *Morlett v. State*, 656 S.W.2d 603, 604 (Tex. App.—Corpus Christi 1983, no pet.) (defendant attempted to coerce State witness, before and during trial, to withhold testimony).

However, subsection (1) broadly covers any witness or prospective witness solicited "to testify falsely." Tex. Penal Code Ann. § 36.05(a)(1). Nothing in the statute indicates that this section applies only to State witnesses, nor has any court construed the language so narrowly. Furthermore, "official proceeding" as used in the Penal Code means "any type of administrative, executive, legislative, or judicial proceeding that may be conducted before a public servant." *Id.* § 1.07(a)(33) (West 2011). Thus, the witness-tampering statute is not limited to witnesses or prospective witnesses who may be called by the State to give testimony during criminal trials. Construing the statute under the plain-meaning rule, we conclude that subsection (1) refers to soliciting any witness or prospective witness in an official proceeding "to testify falsely," including a witness or prospective witness for the defendant.

## 2. Evidence regarding appellant's intent

Appellant next contends no evidence supports a finding that he intended to

6

influence a prospective witness in an official proceeding to testify falsely. As charged, the jury was authorized to convict appellant as the primary actor or as a party to the offense.

Appellant and Belfon were involved in a sexual relationship which ended before May 2007. Belfon has an extensive criminal history, and while on probation, surrendered to authorities for committing Federal Emergency Management Agency ("FEMA") fraud. While Belfon was released on bond during pendency of the FEMA-fraud case, she "would call [appellant] and ask him for money." During one conversation, appellant told Belfon "he knew how [she] could make some money." Although she initially avoided discussions about appellant's plan, he persisted, and Belfon eventually agreed to meet with him.

Belfon provided the following testimony regarding her meeting with appellant. Belfon met appellant in a parking lot where he "told [her] that he wanted [her] to agree to take a charge for some stolen property." Appellant explained that his friend—whom Belfon later learned was Uyamada—had been charged for the theft of two computers but the charge "wasn't a really big deal." Appellant told Belfon he wanted her to provide a "statement" to Uyamada's criminal defense attorney before Uyamada's upcoming court hearing and trip. Appellant also told Belfon, "[You] can make money" and "put [your] own price on it." Belfon agreed to meet with Uyamada to discuss the plan. She also told appellant that she wanted at least $3,000 if she were to claim responsibility for the computers. At trial, Belfon testified that she "needed some money" and was "inclined to come into court or put in an affidavit [she was] responsible." Belfon also testified that appellant was not merely innocently helping a friend "because [appellant] was the one [who gave her] the rundown of what was going on."

At some point prior to meeting with Uyamada, Belfon was informed that the stolen computers belonged to the government. Because of her criminal history, Belfon decided not to claim responsibility for stealing government computers. Instead, she informed law enforcement officers about appellant's plan. After speaking with officers,

7

Belfon scheduled a meeting with appellant and Uyamada for May 17, 2008.

On May 17, officers outfitted Belfon with a concealed video camera and microphone. Belfon then went to a restaurant where she intended to meet appellant. Belfon waited at the restaurant for forty minutes before appellant arrived. Belfon called appellant while she was waiting, and appellant said he wanted her to go to another location after meeting with Uyamada.

When appellant arrived, he and Belfon entered to Uyamada's office. There, Belfon spoke with Uyamada for approximately thirty minutes. Belfon began by stating that appellant had told her "pretty much everything." She and Uyamada then discussed the charges filed against him, and Belfon's role in claiming responsibility for the stolen computers. Uyamada said the charges against him "weren't that strong" but Belfon would likely be charged with theft after claiming she delivered the computers to Uyamada. Uyamada assured Belfon he would help her retain an attorney if she was charged with theft. Uyamada instructed Belfon to tell officers that she delivered the computers to Uyamada's other office located in a separate area of Houston (the "other office"). Although appellant did not speak often during this part of the meeting, he and Uyamada told Belfon that she should familiarize herself with Uyamada's other office. Accordingly, they rode in appellant's vehicle to the other office. Appellant drove while Uyamada sat in the front passenger seat and Belfon sat in the back seat.

During the drive, Belfon asked Uyamada if he was "taking [his case] to trial." Uyamada responded, "No," we are "postponing it." He also explained that he set his case "for disposition" and that it will next be set "for plea." Belfon inquired about her payment, and Uyamada stated she would be paid $3000 in installments, receiving $1000 "down" and the rest later. Belfon also expressed concern that police would aggressively interrogate her after she claimed responsibility for the computers. Uyamada instructed her to tell police that she has limited knowledge regarding computers, did not personally check the subject computers, and delivered them to Uyamada.

When they arrived at the other office, they entered for a brief visit. Subsequently,

they walked to a nearby restaurant. After eating, they returned to the other office, and Uyamada paid Belfon $1000 in cash. Belfon and appellant exited, and Belfon gave appellant $500, pursuant to their agreement that appellant would receive a fee for introducing her to Uyamada. The trio then returned to appellant's vehicle and rode in the same seats they previously occupied. Although the video recording admitted at trial does not contain this portion of the meeting, the audio was preserved. It is unclear exactly what transpired; however, the voices and sounds are consistent with the following events.

Belfon asked when would "the attorney represent everything to the court," apparently inquiring when Uyamada's attorney would attempt to persuade the trial court to dismiss the charges against Uyamada. Uyamada explained that his attorney would speak with Belfon then confer with the prosecutor. Sounds on the recording are indicative of someone parking the vehicle and opening a door. It is unclear whether someone exited at this time. However, "banging" sounds are audible which are consistent with someone pumping gasoline into the vehicle's fuel tank. During the earlier drive to the other office, all three persons discussed the gasoline gauge showing "E."

Uyamada then told Belfon that she might be required to speak with the prosecutor. Belfon asked whether her role in the scheme would end before Uyamada left for his trip. Uyamada said "no" because his trip was scheduled to begin the following Tuesday. Appellant then said Uyamada would return before the end of June, and Uyamada agreed. At this point, sounds preserved on the audio recording are indicative of someone opening a vehicle door. Again, "banging" sounds consistent with pumping gasoline into the vehicle are audible.

Uyamada then stated that he would meet with the prosecutor at the June 2008 hearing and attempt to convince him to "drop the charges." However, Uyamada acknowledged that the prosecutor could decide to proceed to trial. Uyamada said he did not think the case would proceed to trial, but if it did, Belfon "would have to make [her]

9

statement, [she] would have to go to court."[2]   After Uyamada made this statement, sounds audible on the recording are consistent with someone opening a door, starting the vehicle, and fastening a seat belt.  Based on the voices and sounds, the jury was unable to determine whether appellant remained in the vehicle during this part of the discussion— any such conclusion would be merely speculative.  *See Hooper*, 214 S.W.3d at 16 (explaining a finding reached by mere speculation is not supported beyond a reasonable doubt).

Subsequently, appellants drove to a mall parking lot where Belfon exited the vehicle.  Shortly thereafter, officers arrived and retrieved the recording equipment from Belfon.  Over the next month, appellant called Belfon several times.  She did not answer his calls but informed officers that appellant was attempting to contact her. When she finally called appellant, the conversation was audio recorded.  During the conversation, appellant and Belfon agreed that she would meet him the following day to sign a "note" for Uyamada.  Appellant also suggested that Belfon would receive more money.

During cross-examination, Belfon admitted that the majority of the recording pertained to her dialogue with Uyamada.  She testified that "sometimes [appellant] was listening to the conversation and sometimes he was doing other things," including using his phone and a computer or simply not paying attention.  Belfon agreed she "can't speak for what [appellant] heard and didn't hear" and "[i]t's impossible for us to know when [appellant] . . . was paying attention unless he gave a specific response that indicated he was paying attention."  Moreover, Belfon testified that "in all of [her] conversations at all times with [appellant,] he never asked [her] to testify."  The State did not attempt to contradict or clarify this testimony on re-direct examination.

As charged, the jury was authorized to convict appellant if, "acting with intent to

---

[2] During trial, Belfon was asked about Uyamada's statement regarding whether she would be required to testify.  Belfon explained, "I'd have to come in a courtroom like this, give my statement or testimony," "I would have to raise my right hand and tell [a lie]."  Additionally, during cross-examination, Belfon testified, "[Uyamada] told me that I would have to testify and he prepared me to what type of statement I would make if I had to testify."

promote or assist the commission of the offense, he solict[ed], encourag[ed], direct[ed], aid[ed], or attempt[ed] to aid [another] person to commit the offense." *See* Tex. Penal Code Ann. § 7.02(a)(2) (West 2011). Relative to the *mens rea* element of the offense, the State was not required to prove appellant intended that Uyamada would actually commit the offense. Instead, it is sufficient if the State proved that appellant intended to promote or assist Uyamada in committing the offense. *See Hanson v. State*, 55 S.W.3d 681, 689 (Tex. App.—Austin 2001, pet. ref'd); *Richard v. State*, 830 S.W.2d 208, 213 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd). The evidence must show that at the time of the offense, the parties were acting together, each contributing to execution of their common purpose. *Hanson*, 55 S.W.3d at 689; *see also* Tex. Penal Code Ann. § 6.03 (West 2011) ("A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result."). Although an agreement of the parties to act together in common design seldom can be proved by direct evidence, the agreement may be proved by actions of the parties, showing by either direct or circumstantial evidence an understanding and common design to do a certain act. *Pesina v. State*, 949 S.W.2d 374, 383 (Tex. App.—San Antonio 1997, no pet.). In reviewing the evidence regarding appellant's culpability under the law of parties, we may consider events occurring before, during, and after commission of the offense. *Vasquez v. State*, 342 S.W.3d 750, 753 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

Under the above standards, the evidence must support a finding that appellant, acting with *intent* to promote or assist the commission of *witness tampering as charged*, solicited, encouraged, directed, aided, or attempted to aid another person to commit *witness tampering as charged*. *See Hooper*, 214 S.W.3d at 14 n.3. It is insufficient that appellant was involved in a deceitful plan to cajole Belfon into claiming responsibility for the stolen computers. *See Amaya v. State*, 733 S.W.2d 168, 175 (Tex. Crim. App. 1986) ("While [the defendants] were clearly embroiled in the scheme, [the lack of evidence supporting a finding that they acted with intent to promote or assist the commission *of the*

11

*offense*] constrain[s us] to hold that a rational juror could not have found a violation by them of [the offense] beyond a reasonable doubt."). Instead, the evidence must demonstrate that appellant *intended* to assist Uyamada in influencing a prospective witness in an official proceeding to testify falsely. *See Sarmiento v. State*, 93 S.W.3d 566, 570 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (en banc) ("The offense here was aggravated robbery, and the use of a deadly weapon was alleged in the indictment as an element of the offense. Thus, before jurors were authorized to find appellant guilty, *even as a party*, they first had to believe beyond a reasonable doubt that appellant knew a deadly weapon would be used in the commission of the offense.").

We conclude the following evidence supports a rational inference that Uyamada and appellant concocted a detailed scheme, and appellant was aware of the role Belfon would play in the scheme if Uyamada's case proceeded to trial:

(1) the obvious purpose of the scheme was to deceive the prosecutor into dismissing the theft charges filed against Uyamada by paying Belfon to claim responsibility for the stolen computers;

(2) appellant knew Belfon had financial difficulties, solicited her to participate in the scheme, and introduced her to Uyamada;

(3) during the May 17 meeting, appellant was generally present during discussions between Uyamada and Belfon, participated in some of the conversations, and drove the trio to Uyamada's other office;

(4) appellant demonstrated knowledge regarding Uyamada's travel schedule prior to the June hearing;

(5) Uyamada told Belfon she would be required to testify falsely if the prosecutor did not dismiss the charges; although Uyamada apparently gave this instruction while appellant was outside the vehicle, there is no evidence Uyamada instructed Belfon not to speak with appellant about her testifying at trial; and

(6) appellant contacted Belfon following the May 17 meeting to inform her Uyamada had returned from his trip and that she was required to sign a statement.

Based on the above evidence—particularly the sounds and conversation that occurred while appellant exited and re-entered the vehicle the jury could have logically concluded that appellant and Uyamada discussed their strategy relative to Belfon, including the possibility that Belfon would be required to testify at trial if the prosecutor

12

did not dismiss the charges. *See Hooper*, 214 S.W.3d at 16 ("An inference is a conclusion reached by considering other facts and deducing a logical consequence from them.").

The fact appellant may not have been present in the vehicle during the above conversation is not determinative. Under the Penal Code, a defendant may be culpable for tampering with a witness even if he was not physically present when the offense was committed. *Guevara v. State*, 152 S.W.3d 45, 51–52 (Tex. Crim. App. 2004). It is sufficient that appellant participated in the scheme which included arranging payments to Belfon in exchange for her agreement to testify falsely. *See Cross v. State*, 550 S.W.2d 61, 63–64 (Tex. Crim. App. 1977) (concluding evidence supported defendant was guilty of robbery as party to offense, notwithstanding that he did not participate in actual robbery, because he participated in planning the robbery).

Accordingly, we hold the evidence is legally sufficient to support a finding that appellant, with intent to promote or assist Uyamada in committing witness tampering, aided Uyamada in the commission of the offense *See* Tex. Penal Code Ann. §§ 7.02(a)(2); 36.05(a)(1); *Hooper*, 214 S.W.3d at 14 n.3. Appellant's first issue is overruled.

### III.  CHARGE ERROR

In his second issue, appellant contends the trial court committed charge error by using the term "prospective witness" in the application paragraph of the jury charge instead of "witness." When we review a claim of jury charge error, we first determine whether there is error in the charge. *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009).

As noted above, section 36.05(a)(1) provides, "A person commits [the offense of tampering with a witness] if, *with intent to influence the witness*, he offers, confers, or agrees to confer any benefit on a witness or prospective witness in an official proceeding . . . to testify falsely." Tex. Penal Code Ann. § 36.05(a)(1) (emphasis added).

13

In the indictment, the State alleged that appellant "on or about May 17, 2008, did then and there unlawfully, *with intent to influence a PROSPECTIVE WITNESS*, in an official proceeding, to wit: [the computer theft prosecution], OFFER AND CONFER AND AGREE TO CONFER A BENEFIT ON SABRINA BELFON to TESTIFY FALSELY." (emphasis added).

In the jury charge, the abstract instruction tracked the language in section 36.05(a)(1), but the application paragraph tracked the language in the indictment. The application paragraph contained the following language:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 17th day of May, 2008, . . . [appellant] did then and there unlawfully, *with intent to influence a prospective witness*, in an official proceeding, to-wit: [the computer theft case], offer or confer or agree to confer a benefit on Sabrina Belfon to testify falsely; or if you find from the evidence beyond a reasonable doubt that on or about the 17th day of May, 2008, . . . [Uyamada] did then and there unlawfully, *with intent to influence a prospective witness*, in an official proceeding, to-wit: [the computer theft case], offer or confer or agree to confer a benefit on Sabrina Belfon to testify falsely, and that [appellant], with intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid [Uyamada] to commit the offense, if he did, then you will find [appellant] guilty of tampering with a witness, as charged in the indictment.

(emphasis added).

Assuming, *arguendo*, that the charge is erroneous because the trial court submitted language in the application paragraph that deviated from language in the statute, we conclude the alleged error was harmless.

When, as here, a defendant fails to object to charge error, reversal is warranted only if the defendant was egregiously harmed. *See Warner v. State*, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008). To determine "egregious harm," we examine the entire jury charge, the state of the evidence, including the contested issues and weight of the probative evidence, the arguments of counsel, and any other relevant information revealed by the record of the trial as a whole. *Id.* (citation omitted). The appellant must

14

have suffered actual, rather than theoretical, harm. *Id.* Actual harm is demonstrated if the charge error affected the very basis of the case, deprived the defendant of a valuable right, or vitally affected a defensive theory. *Id.* (citation omitted).

Appellant presents multiple purported reasons that the alleged charge error was egregiously harmful. First, he contends the incorrect instruction regarding the specific intent element of the offense affected "the very basis of the case" because "the charge created the risk that one or more jurors would reach a guilty verdict without appreciating that the State had to show [appellant] intended to influence a testifying witness, not just a prospective witness." According to appellant, the erroneous "with intent to influence a prospective witness" instruction authorized the jury to convict him for merely writing a misleading letter to Uyamada's attorney.

Second, appellant argues that resort to the remaining instructions in the charge did not ameliorate the error because the terms "witness" and "prospective witness" were not defined in the charge and the error was in the essential application portion of the charge which, unlike the abstract portion, actually "authorizes the jury to act." *See Hutch v. State*, 922 S.W.2d 166, 172 (Tex. Crim. App. 1996) (recognizing, "It is not sufficient for the jury to receive [a correct] abstract instruction on the law").

Third, appellant argues that evidence of guilt was not overwhelming because the direct evidence pertaining to his communication with Belfon demonstrated that he wanted her to "take the charge" and sign a false statement—not testify falsely. Additionally, appellant argues it is difficult to understand what appellant and Uyamada said on the video and audio recordings. In fact, during deliberations, the jury requested a transcript of the recordings; the trial court responded that a transcript was not in evidence. Appellant argues the jury may have decided they could determine guilt without understanding the content of the recordings because they could convict appellant for merely intending to influence Belfon as a prospective witness.

Finally, appellant argues that the charge error was exacerbated by the trial court's allegedly erroneous decision to sustain the State's objection to that portion of appellant's

15

closing argument in which he purportedly correctly stated the law regarding witness tampering. We agree the only direct evidence regarding appellant's solicitation of Belfon is that he asked her to "take a charge" for Uyamada and sign a statement or note claiming responsibility for the stolen computers. Furthermore, as explained below in section V., appellant may have caused some confusion regarding whether the phrase "to testify falsely" included unsworn statements. We also acknowledge that there is a distinction between "witness" and "prospective witness." *See Cada*, 334 S.W.3d at 771–76 (recognizing that "witness," as used in the retaliation statute, refers to those who have already testified in some official proceeding and is distinct from "prospective witness").

Nevertheless, after examining the entire record, we conclude the trial court's inclusion of the phrase "with intent to influence a prospective witness" instead of "with intent to influence the witness" did not increase the likelihood that the jury would convict appellant for requesting Belfon to write a letter or caused any other egregious harm to appellant. *See Warner*, 245 S.W.3d at 461 (explaining egregious harm is actual, not theoretical). The term "prospective witness," even if erroneously used, did not affect the meaning of the phrase "to testify falsely." The meaning of "testify" is the actual basis for appellant's concern that he may have been convicted for merely soliciting a deceitful letter. The jury's decision regarding whether appellant intended to influence a prospective witness is sufficiently disconnected from its interpretation or understanding of the word "testify." Additionally, the State did not argue that the term "prospective witness" meant the jury could convict appellant for merely asking Belfon to write a letter.

Accordingly, even if we assume in the jury charge, appellant was not egregiously harmed. Appellant's second issue is overruled.

### IV. CONSOLIDATION OF CASES

In his third issue, appellant contends the trial court erred by consolidating the State's cases against Uyamadu and appellant. In his related fourth issue, appellant contends the trial court erred by failing to sever the consolidated cases.

16

Article 36.09 of the Code of Criminal Procedure, entitled "Severance on separate indictments," provides as follows:

> Two or more defendants who are jointly or separately indicted or complained against for the same offense or any offense growing out of the same transaction may be, in the discretion of the court, tried jointly or separately as to one or more defendants; provided that in any event either defendant may testify for the other or on behalf of the state; and provided further, that in cases in which, upon timely motion to sever, and evidence introduced thereon, it is made known to the court that there is a previous admissible conviction against one defendant or that a joint trial would be prejudicial to any defendant, the court shall order a severance as to the defendant whose joint trial would prejudice the other defendant or defendants.

Tex. Code Crim. Proc. Ann. art. 36.09 (West 2007).

On appeal, appellant argues that the trial court improperly applied Penal Code section 3.02 when the cases were consolidated. *See* Tex. Penal Code Ann. § 3.02 (West 2011) (pertaining to joinder of claims against a single defendant). In its "Notice of Intent to Consolidate Prosecutions," the State relied on section 3.02.[3] However, appellant never objected to the State's filing or argued that section 3.02 is an improper legal basis for consolidation. Thus, appellant did not preserve any error. *See* Tex. R. App. P. 33.1. Accordingly, we overrule appellant's third issue.

In his fourth issue, appellant contends the trial court erred by denying his motion to sever the cases because the joint trial was prejudicial to appellant. On appeal, he asserts numerous reasons why he was purportedly prejudiced, including antagonistic defenses and a "spill over" problem, whereby the jury considered specific evidence pertaining to Uyamada's theft when it determined appellant's guilt for witness tampering.

In his motion to sever, appellant argued, "To have [appellant] be tried jointly with [Uyamada] for an offense for which [appellant] has not been charged and for a case which does not arise out of the same transaction would be prejudicial." In his motion and

---

[3] The State now concedes that section 3.02, entitled "Consolidation and Joinder of Prosecutions," did not provide authority for consolidating the cases.

during pretrial hearings, appellant did not specify any reasons why the joint trial would be prejudicial. During the third day of trial, appellant argued that two exhibits pertaining to stolen computers, in light of all the other evidence presented regarding the computer theft, were prejudicial by linking him to the theft. The trial court responded, "Okay. I understand that position. All right. Well, that objection's overruled."

The conclusory "prejudicial" objection which appellant made prior to presentation of the evidence was not sufficient to inform the trial court regarding any reasons evidence adduced in the theft case would be prejudicial to appellant's defense. *See* Tex. R. App. P. 33.1; *Zunker v. State*, 177 S.W.3d 72, 78 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). Additionally, the "prejudicial" objection appellant asserted during the third day of trial was untimely; appellant was clearly aware prior to trial that evidence pertaining to the computer theft might be prejudicial to him and, thus, he could have raised this issue earlier. *See Qualley v. State*, 206 S.W.3d 624, 631 (Tex. Crim. App. 2006) (concluding ground for severance must be raised in timely manner). Accordingly, appellant did not preserve this argument for appellate review.

We hold the trial court did not err by denying appellant's motion for severance. Appellant's fourth issue is overruled.

## V. JURY ARGUMENT

Finally, in his fifth issue, appellant contends the trial court erred by sustaining the State's objection to appellant's jury argument and denying his counsel an opportunity to state the law correctly to the jury.

We review the trial court's ruling on the State's objection to appellant's jury argument for abuse of discretion. *See Davis v. State*, 329 S.W.3d 798, 825 (Tex. Crim. App. 2010). Although the trial court has broad discretion in controlling the scope of closing argument, it may not prevent defense counsel from making a point essential to the defense. *Lemos v. State*, 130 S.W.3d 888, 892 (Tex. App.—El Paso 2004, no pet.). Prohibiting counsel from making such a jury argument constitutes denial of the

defendant's right to counsel if the defendant was entitled to make the argument. *Davis*, 329 S.W.3d at 825. Jury argument that misstates the law or is contrary to the court's jury charge is improper. *See Thomas v. State*, 336 S.W.3d 703, 713 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd); *Peak v. State*, 57 S.W.3d 14, 18 (Tex. App.—Houston [14th Dist.] 2001, no pet.). We determine *de novo* whether a party misstated the law during jury argument. *Thomas*, 336 S.W.3d at 713.

Appellant complains regarding the following rulings:

[Appellant's counsel]: An official proceeding, and here -- this is the gut -- these are the guts of the case, this is what it's about. Again, I'm not talking about the theft. The tampering with the witness, the elements are very clear and they're in the charge for you, but you boil it all down and an individual has to convey a benefit or offer to convey a benefit to a prospective witness to get that witness to testify falsely. Not to give a statement, not to write a note, not to accept responsibility, not to do any of these other things. They have to be told, they have to be trying to get this individual to testify, and testify means something.

You testify in an official proceeding is the other part of the charge. You read it. You testify in an official proceeding. You have to go to a proceeding. You have to raise your hand. You have to swear to tell the truth.

[Prosecutor]: Objection, your Honor, that's a misstatement of the law.

[Trial Court]: That's sustained.

[Appellant's counsel]: To testify in an official proceeding, you have to take an oath, and you have to be present to testify. Now --

[Prosecutor]: Objection, your Honor, that's a misstatement of the law.

[Trial Court]: That's sustained.

[Appellant's counsel]: It could include a deposition which also would require taking an oath, swearing to tell the truth, raising your hand, but if you were going to testify in an official proceeding, that's not a handwritten note that you give to somebody else.

[Prosecutor]: Objection, your Honor, that's a misstatement of the law.

[Trial Court]: That's sustained.

[Prosecutor]: Ask for an instruction for the jury to disregard.

[Trial Court]: The jury will disregard counsel's last statement.

19

[Appellant's counsel]: I'm sorry, your Honor. My statement was that a handwritten note that was not under oath is not testimony. Your ruling is that that is testimony?

[Trial Court]: I've made my ruling.

[Appellant's counsel]: I'm trying to not run afoul of your rulings, Judge.

Appellant argues that the trial court erred by denying him the opportunity to explain to the jury "that merely handing someone else a written note is not the same thing as being a witness and testifying." However, we disagree that this proposition was necessarily the import of appellant's jury argument.

The crux of appellant's argument appears to be that the accused must have influenced a prospective witness *to testify falsely in an official proceeding*. However, "[a] person commits [tampering with a witness] if . . . he offers, confers, or agrees to confer any benefit on *a witness or prospective witness in an official proceeding . . . to testify falsely.*" Tex. Penal Code Ann. § 36.05(a)(1). Accordingly, under the statute, the person solicited must be a witness or prospective witness in an official proceeding, but the objective of the solicitation need not be for the person to testify falsely in an official proceeding. *See Thompson*, 236 S.W.3d at 792 (recognizing that courts interpret statutory language according to its plain meaning).

The word "testify" is not defined in the Penal Code. Statutory terms not legislatively defined are generally construed as common usage allows, but terms that have an acquired a known and established legal meaning are generally construed in their legal sense. *Medford v. State*, 13 S.W.3d 769, 771–72 (Tex. Crim. App. 2000). We conclude "testify" as used in section 36.05 has a specific legal meaning: "to make a solemn declaration under oath for purpose of establishing a fact (as in a court)." Webster's Ninth New Collegiate Dictionary 1219 (9th ed. 1991); *see also see also* Black's Law Dictionary (9th ed. 2009) (defining "testify" as "To give evidence as a witness" or "to bear witness" and "Testimony" as "Evidence that a competent witness

under oath or affirmation gives at trial or in an affidavit or deposition").[4] Therefore, a person may be guilty of witness tampering if he solicits a witness or prospective witness in an official proceeding to testify falsely, whether during an official proceeding or deposition or in an affidavit.[5]

This interpretation is logical in context of subsections (a)(2), (a)(3), and (a)(5) of section 36.05, which do not require that the witness or prospective witness be persuaded to appear in an official proceeding. *See* Tex. Penal Code Ann. § 36.05(a)(2), (3), & (5) (prohibiting solicitation of witness or prospective witness in an official proceeding "(2) to withhold any testimony, information, document, or thing; (3) to elude legal process summoning him to testify or supply evidence; . . . or (5) to abstain from, discontinue, or delay the prosecution of another"); *see also Thomas v. State*, 919 S.W.2d 427, 430 (Tex. Crim. App. 1996) ("We always strive to give words and phrases meaning within the context of the larger provision.").

Appellant's counsel initially argued to the jury without objection that "testify" means more than merely writing a letter:

> [A]n individual has to convey a benefit or offer to convey a benefit to a prospective witness to get that witness to testify falsely. Not to give a statement, not to write a note, not to accept responsibility, not to do any of these other things. They have to be told, they have to be trying to get this individual to testify, and testify means something.

Thereafter, appellant's counsel thrice mentioned that, under the jury charge, appellant must have solicited a person "to testify in an official proceeding." The trial court

---

[4] Obviously, as used in the context of section 36.05(a)(1), the Legislature did not intend for "testify" to include congregants "testifying" regarding their conversion experiences. *See* Webster's Ninth New Collegiate Dictionary 1219 (noting that one definition of "testify" is "to express a personal conviction").

[5] We acknowledge that in *Bingham v. State*, the Court of Criminal Appeals determined the term "testimony" as used in the accomplice-witness statute refers to evidence "adduced in open court by live witnesses under oath." 913 S.W.2d 208, 210 (Tex. Crim. App. 1995). We do not apply this definition to the term "testify" as used in the witness-tampering statute because the obvious legislative intent of the statute is to prohibit offenders from soliciting witnesses and prospective witnesses in official proceedings to provide false testimony. Limiting the word "testify" to testimony provided in open court would be inconsistent with the Legislature's intent as expressed in the statute.

properly sustained the State's objections to these arguments because testifying in an official proceeding is not an element of witness tampering. *See Thomas*, 336 S.W.3d at 713 ("Argument that misstates the law or is contrary to the court's charge is improper.").

We acknowledge that appellant's counsel asked the trial court to explain its ruling, "My statement was that a handwritten note that was not under oath is not testimony. Your ruling is that that is testimony?" However, the trial court replied, "I've made my ruling." Earlier, appellant's counsel argued, "It could include a deposition which also would require taking an oath, swearing to tell the truth, raising your hand, *but if you were going to testify in an official proceeding*, that's not a handwritten note that you give to somebody else." (emphasis added). Because the trial court could have reasonably construed appellant's argument to be an assertion that a necessary element of witness tampering is testifying in an official proceeding, the court did not err by sustaining the State's objection. *See Davis*, 329 S.W.3d at 825. Appellant's fifth issue is overruled.

We affirm the trial court's judgment.


/s/    Charles W. Seymore
Justice


Panel consists of Justices Frost, Seymore, and Jamison.

Publish — Tex. R. App. P. 47.2(b).