# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00274-CR

John Anthony Valdez, Jr., Appellant

v.

The State of Texas, Appellee

### FROM THE DISTRICT COURT OF BELL COUNTY, 264TH JUDICIAL DISTRICT
### NO. 64755, HONORABLE MARTHA J. TRUDO, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is one of three appeals arising from a capital murder trial against three co-defendants. The jury convicted the appellant in this cause, John Anthony Valdez, Jr., of the offense of capital murder for remuneration. *See* Tex. Penal Code Ann. § 19.03(a)(3) (West Supp. 2011). The State did not seek the death penalty, and punishment was automatically assessed at life imprisonment without the possibility of parole. In two issues on appeal, Valdez asserts that the district court abused its discretion in denying his motion to sever his trial from the trials of his co-defendants, Kathryn Nellie Briggs and Kyle James Moesch, and that the evidence is insufficient to prove that he committed the offense.[1] We will affirm the judgment of conviction.

---

[1] Briggs and Moesch filed similar motions to sever, which were also denied. Both Briggs and Moesch were also convicted of capital murder. Briggs's appeal is before us as cause number 03-11-00275-CR, while Moesch's appeal is before us as cause number 03-11-00267-CR.

**BACKGROUND**

The jury heard evidence that on October 14, 2008, the body of Fort Hood Staff Sergeant Ryan Sullivan was discovered in the apartment where he had lived. Dr. Reid Quinton, a medical examiner who had performed an autopsy on the body, testified that Sullivan had received approximately 34 stab wounds to his abdomen, head, and other areas of his body, including defensive stab wounds to his arms and hands and likely fatal stab wounds that punctured his neck, heart, and lungs. Quinton also testified that the level of decomposition in the body was consistent with Sullivan having been killed in the early morning hours of October 11. The State's theory at trial was that Valdez had killed Sullivan, that Moesch had assisted Valdez in the crime, and that Briggs, who had been in a past romantic relationship with Sullivan, had orchestrated the killing in order to recover proceeds from Sullivan's life insurance policy, of which she was a named beneficiary.

The complex factual background of this case is fully discussed in this Court's opinion affirming the conviction of Valdez's co-defendant Briggs and will not be repeated here. *See Briggs v. State*, No. 03-11-00275-CR (Tex. App.—Austin Aug. 24, 2012, no pet. h.) (mem. op., not designated for publication). We discuss further background details only as necessary to address the issues raised by Valdez in this appeal.

**ANALYSIS**

**Motion to sever**

In his first issue, Valdez asserts that the district court abused its discretion in denying his motion to sever his trial from the trials of his co-defendants. Severance is governed by article 36.09 of the code of criminal procedure, which provides that two or more defendants may,

2

at the discretion of the court, be tried jointly for any offense growing out of the same transaction unless, upon timely motion to sever, it is shown either that there is a previous admissible conviction against one defendant or that a joint trial would be prejudicial to any defendant. Tex. Code Crim. Proc. Ann. art. 36.09 (West 2007). Valdez argues only the second ground, contending that he was prejudiced by a joint trial with Briggs and Moesch.

In drafting article 36.09, "the Legislature intended for defendants accused of the same offense to be tried together most of the time." *Qualley v. State*, 206 S.W.3d 624, 631 (Tex. Crim. App. 2006). "'Prejudice,' then, cannot mean the types of circumstances or disagreements between parties that would normally be expected to [arise] during any trial containing multiple defendants.'" *Id*. Rather, "[t]o establish prejudice, the defendant must show a serious risk that a specific trial right would be compromised by a joint trial, or that a joint trial would prevent the jury from making a reliable judgment about guilt or innocence, and that the problem could not be adequately addressed by lesser curative measures, such as a limiting instruction." *Id*. at 636. It is not enough for the defenses of co-defendants to be mutually exclusive or antagonistic. *See id*.

In urging his motion to sever below, Valdez argued to the district court that he would be prejudiced by a joint trial with Moesch because of the "detailed statement" that Moesch gave to the police in which Moesch implicated Valdez in the offense. Valdez also expressed concern about Moesch's hearsay statement to Jacobs in which Moesch allegedly told Jacobs, "It's done, Sully's dead." Valdez further argued that his trial should be severed from Briggs's trial because he had "no idea" what her defensive theory would be and thus could not adequately prepare for it.

The district court would not have abused its discretion in concluding that Valdez's concerns are "the types of circumstances or disagreements between parties that would normally

3

be expected to [arise] during any trial containing multiple defendants" and thus do not demonstrate prejudice. *See id*. at 631. Regarding Valdez's alleged inability to prepare for Briggs's defense, the district court could have reasonably concluded that there is nothing unusual about one co-defendant being unaware of another co-defendant's defensive theory of the case. Regarding Moesch's statements that implicated Valdez in the murder, the district court would not have abused its discretion in concluding that any prejudice could be adequately addressed by lesser curative measures. In fact, the record reflects that all references to Valdez were redacted from Moesch's statements to the police. As for the hearsay statements made by Moesch or Briggs that, according to Valdez, were admissible against them but were inadmissible against Valdez, the district court provided a detailed limiting instruction in the charge instructing the jury that any such statements were admitted "solely for the purpose of serving as evidence in the cases of" Moesch and Briggs and that "such statements cannot be considered as any evidence against [Valdez] or in any way connect [Valdez] with the alleged offense." The limiting instruction further provided that the jury "must not consider such alleged statements of [Moesch and Briggs], if any, in any way as any evidence whatsoever against [Valdez] and you will restrict your consideration of such statements, if any, to the determination of the guilt or innocence of [Moesch and Briggs], if you do consider it, and not to [Valdez]." Such an instruction, the district court could have reasonably found, would alleviate any risk of prejudice to Valdez. *See id*.; *see also Zafiro v. United States*, 506 U.S. 534, 539-41 (1993) (explaining that "even if there were some risk of prejudice" in a joint trial, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice").

On this record, Valdez has failed to show "a serious risk that a specific trial right would be compromised by a joint trial, or that a joint trial would prevent the jury from making

4

a reliable judgment about guilt or innocence." *See Qualley*, 206 S.W.3d at 636. Accordingly, we cannot conclude that the district court abused its discretion in denying Valdez's motion to sever. We overrule Valdez's first issue.

**Sufficiency of the evidence**

In his second issue, Valdez asserts that the evidence is insufficient to prove that he committed the murder and that, if he did, he committed it "for remuneration." Specifically, Valdez argues that the evidence tends to show, at most, that he did nothing more than prepare to commit the offense and that Moesch, rather than Valdez, was the person who followed through with the murder.

To determine whether evidence is sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *Gear*, 340 S.W.3d at 746; *Brooks*, 323 S.W.3d at 899.

An inference is a conclusion reached by considering other facts and deducing a logical consequence from them. *Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007). A reviewing court determines whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Clayton*

5

*v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (citing *Hooper*, 214 S.W.3d at 16-17). When the record supports conflicting inferences, a reviewing court must presume that the fact finder resolved the conflicts in favor of the prosecution and defer to that determination. *See Jackson*, 443 U.S. at 326. Each fact need not point directly and independently to the appellant's guilt, as long as the cumulative effect of all incriminating facts is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Circumstantial evidence is as probative as direct evidence in establishing guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Id*.

Sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case. *Johnson v. State*, 364 S.W.3d 292, 294 (Tex. Crim. App. 2012); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Johnson*, 364 S.W.3d at 294; *Malik*, 953 S.W.2d at 240.

As charged in this case, a person commits the offense of murder if he intentionally or knowingly causes the death of an individual. Tex. Penal Code Ann. § 19.02(b)(1) (West 2011). Murder is a capital offense if it is committed for remuneration or the promise of remuneration. *Id*. § 19.03(a)(3). Remuneration occurs when an "actor kills a victim in order to receive a benefit or financial settlement paid upon the death of the victim, such as proceeds of insurance and retirement benefits." *Beets v. State*, 767 S.W.2d 711, 737 (Tex. Crim. App. 1988) (op. on reh'g). Remuneration "does not require the narrow construction requiring payment by a principal to an agent." *Rice v. State*, 805 S.W.2d 432, 434 (Tex. Crim. App. 1991) (en banc). Rather, the term

remuneration as used in section 19.03(a)(3) "encompasses a broad range of situations, including compensation for loss or suffering and the idea of a reward given or received because of some act." *Beets*, 767 S.W.2d at 734; *Johnson v. State*, 208 S.W.3d 478, 495 (Tex. App.—Austin 2006, pet. ref'd). "The focus is on the actor's intent or state of mind: did [he] kill in the expectation of receiving some financial benefit or compensation?" *Johnson*, 208 S.W.3d at 495.

Valdez was charged under the law of parties. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both. Tex. Penal Code Ann. § 7.01(a) (West 2011). A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id*. § 7.02(a)(2) (West 2011). Participation as a party may be shown by events occurring before, during, and after the commission of the offense, and may be demonstrated by actions showing an understanding and common design to do the prohibited act. *Salinas v. State*, 163 S.W.3d 734, 739-40 (Tex. Crim. App. 2005); *Nzewi v. State*, 359 S.W.3d 829, 836 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd).

In this case, as explained fully in our opinion in *Briggs*, *supra*, there was evidence tending to show the following:

- Valdez served in the same Army unit as Sullivan, and they were friends.

- While Sullivan and Briggs were dating, Valdez formed a close relationship with Briggs.

- Valdez told others that he was dating and planning to marry a woman named "Airianna Benitez," who, the jury could have reasonably inferred from phone records and other evidence, was a fictional alias of Briggs.

7

- The friendship between Sullivan and Valdez deteriorated around the same time that the relationship between Sullivan and Briggs deteriorated.

- In the months leading up to the murder, Valdez was a "fairly regular guest" at the Austin apartment where Briggs was staying at around the same time as her relationship with Sullivan was ending.

- Two months prior to the murder, Valdez got into a heated argument with Sullivan at a bar in Austin and, after the argument was over, his friends took him to another bar in Austin where he was supposed to meet up with Briggs.

- Prior to the murder, Valdez informed Jacobs "that there was a hit on [Sullivan] and that [Valdez] was going to carry it out." Valdez also told Jacobs that "he was going to go kill [Sullivan] at night," that the people who had ordered the hit had paid Valdez $100,000 to do the job, and that he was offering Jacobs and Moesch "$2,000 each to help get rid of the body after he was done."[2]

- According to Jacobs, shortly after announcing his plan to kill Sullivan, Valdez sought to obtain a stun gun and "paralytic agents" to "incapacitate" Sullivan.

- Jacobs further testified that Valdez told him "that he went through a drug reference book and found some of the chemicals that are used in lethal injections and showed it to me in his pack." According to Jacobs, Valdez

---

[2] Valdez asserts that because Jacobs was offered $2,000 to participate in the murder, he was an accomplice to the crime and, therefore, his testimony cannot be considered in a sufficiency analysis unless it is first corroborated by other evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005) ("A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."). However, an accomplice is an individual who participates with a defendant before, during, or after the commission of the crime and acts with the requisite culpable mental state. *Paredes v. State*, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004). The record supports a finding that Jacobs did not accept the $2,000 or otherwise participate in the crime with the requisite intent and was not, therefore, charged as an accomplice for purposes of the accomplice-witness rule. *See Cocke v. State*, 201 S.W.3d 744, 748-49 (Tex. Crim. App. 2006) ("[A]n individual [is not] an accomplice merely because he has knowledge about a crime and fails to disclose that knowledge."). Moreover, even if Jacobs had been charged as an accomplice, there is other evidence tending to connect Valdez to the murder, including the cell phone records tending to show that he was at Sullivan's apartment at the time Sullivan was murdered.

claimed "that he found two of the three chemicals used in lethal injection and he took them."

- The Thursday before the weekend in which Sullivan was killed, Valdez met with Briggs in Austin to give her a key to what co-workers described as the apartment of Briggs's boyfriend in Killeen. The jury could have reasonably inferred from this and other evidence that the key belonged to Sullivan's apartment.

- The night of the murder and the morning after, Valdez exchanged numerous phone calls and text messages with Briggs and Moesch. Some of these calls were traced to a cell phone tower in the vicinity of the apartment where Sullivan was killed.

- The day and night after the murder, Valdez socialized with Briggs and Moesch at a bar in Austin. One witness, Sammy Gonzalez, testified that Valdez and Moesch spent time together outside the bar, "talking and smoking." Gonzalez also testified that he had received a text message from Valdez stating that the police were looking for Valdez and asking Gonzalez to tell the police that Valdez was with him that weekend.

- When Jacobs discovered that Sullivan had been killed, he asked Valdez if he had killed Sullivan. According to Jacobs, Valdez "just looked at [him] and kind of gave me a smirk."

- At some later date, after the police had initially questioned Valdez about the offense, Jacobs "asked [Valdez] how that went." Valdez's response, according to Jacobs, was the following: "[H]e just looked at me and said they don't have anything that's ever going to stick. And I asked him again, did you do it? And his response was, 'What do you think,' and he just kind of gave me some—like a little twisted smile or a smirk."

- Bank statements revealed that Valdez transferred money from his checking accounts into Briggs's checking and savings accounts.

- Shortly before Valdez was arrested, Briggs withdrew $4,000 cash from her checking account. After Valdez was arrested, over $4,000 in cash was found in a bank envelope inside a jacket allegedly belonging to Valdez. Phone records tend to show that Briggs was in the vicinity of the motel where Valdez was staying and the cash was found.

- Valdez made and received numerous phone calls while in jail to and from phone numbers that were associated with either Briggs or her alias

9

"Airianna." Also, jail records tended to show that Valdez was visited by Briggs while he was in jail and received hundreds of dollars from Briggs that were deposited into his inmate account.

Viewed in the light most favorable to the verdict, the combined and cumulative force of all of the above incriminating circumstances supports a finding by the jury that Valdez did more than merely prepare to commit the offense. According to Jacobs, Valdez told him and Moesch "that there was a hit on [Sullivan] and that [Valdez] was going to carry it out." Jacobs further testified that Valdez offered Jacobs and Moesch money to help him "get rid of the body" after he was done. Also, there was evidence tending to show that Valdez made phone calls to and exchanged text messages with Moesch before and after the offense, had access to Sullivan's apartment, made incriminating statements to Jacobs after the murder was committed suggesting that he did, in fact, kill Sullivan, and was in frequent communication with Briggs and her alleged alias, "Airianna," before, during, and after the commission of the offense. From this and other evidence, the jury could have reasonably inferred that Valdez either committed the offense himself, or solicited, encouraged, directed, aided, or attempted to aid Briggs and Moesch in committing the offense. Viewing all of the evidence in its totality and in the proper light, we conclude that the evidence is sufficient to support the jury's finding that Valdez was criminally responsible as a party to the offense.

The evidence is likewise sufficient to prove that Valdez committed the offense "for remuneration." Jacobs testified that Valdez had told him that Valdez had been offered $100,000 to kill Sullivan and that Valdez had offered Jacobs and Moesch "$2,000 each" to help him dispose of the body. Additionally, the evidence tends to show that Valdez and Briggs exchanged significant

amounts of money following the offense, including $4,000 that was found in a bank envelope in Valdez's jacket following his arrest, hundreds of dollars that were transferred from Valdez's checking accounts to Briggs's checking and savings accounts, and hundreds of dollars that Briggs deposited into Valdez's inmate account. Based on the combined and cumulative force of this and other evidence, the jury could have reasonably inferred that Valdez killed Sullivan, or participated in the killing of Sullivan, in order to receive money from Briggs that she was entitled to receive under Sullivan's life insurance policy. We overrule Valdez's second issue.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed

Filed:   August 24, 2012

Do Not Publish

11