ACCEPTED
01-15-00183-CR
FIRST COURT OF APPEALS
HOUSTON, TEXAS
7/31/2015 11:33:28 AM
CHRISTOPHER PRINE
CLERK

NO. 01-15-00183-CR

IN THE COURT OF APPEALS
FOR THE FIRST DISTRICT OF TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

7/31/2015 11:33:28 AM

CHRISTOPHER A. PRINE
Clerk

ROY VASQUEZ
*Appellant*

v.

THE STATE OF TEXAS
*Appellee*

On Appeal from Cause Number 1437421
In the 230th Criminal District Court of Harris County, Texas

**BRIEF FOR APPELLANT**

ORAL ARGUMENT REQUESTED

**ALEXANDER BUNIN**
Public Defender
Harris County, Texas

**MARK KRATOVIL**
Assistant Public Defender
Texas Bar Number 24076098
1201 Franklin Street, 13th Floor
Houston, Texas 77002
Telephone: (713) 274-6728
Facsimile: (713) 437-4339
mark.kratovil@pdo.hctx.net

**Counsel for Appellant**

## IDENTITY OF PARTIES AND COUNSEL

APPELLANT

Roy Vasquez
TDCJ # 01983466
Eastham Unit
2665 Prison Road #1
Lovelady, Texas 75851

DEFENSE COUNSEL AT TRIAL

Asha Reddi
14090 Southwest Freeway
Suite 300
Sugar Land, Texas 77478

Grant Scheiner
2211 Norfolk Street
Suite 735
Houston, Texas 77098

PROSECUTORS AT TRIAL

Sarah Roberts
Assistant District Attorney

Lisa Calligan
Assistant District Attorney
Harris County, Texas
1201 Franklin Street, 6th Floor
Houston, Texas 77002

PRESIDING JUDGE

The Honorable Brad Hart
230th Criminal District Court
1201 Franklin Street, 16th Floor
Houston, Texas 77002

APPELLANT'S COUNSEL

Mark Kratovil
Assistant Public Defender
Harris County, Texas
1201 Franklin Street, 13th Floor
Houston, Texas 77002

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ........................................................... ii

TABLE OF CONTENTS ................................................................................. iii

INDEX OF AUTHORITIES ............................................................................ v

STATEMENT OF THE CASE ......................................................................... 1

ISSUE PRESENTED ..................................................................................... 1

STATEMENT OF FACTS ............................................................................... 2

    A. The Complainant's Version Of Events ................................................ 2

    B. The Appellant's Version Of Events .................................................... 5

    C. Law Enforcement's Investigation Of the Incident .............................. 9

SUMMARY OF THE ARGUMENT ................................................................. 11

ARGUMENT ............................................................................................... 12

    **SOLE ISSUE:** The trial court erred in not permitting defense counsel to go into the requirements of sex offender registration during closing arguments during the punishment phase, and in doing so effectively denied the Appellant his right to counsel. .......................................................................... 12

    A. Error Is Preserved For Appellate Review, As the Appellant Received an Adverse Ruling and Supplemented the Record With an Offer Of Proof ............... 13

    B. Counsel Is Entitled To Argue Correct Statements Of Law To the Jury And Sexual Assault Requires Lifetime Registration As a Sex Offender ..................... 16

        a. Arguments to the jury may contain correct statements of the law, even if the argued law is not included in the jury charge ...................................... 16

        b. A conviction for sexual assault requires lifetime registration as a sex offender .................................................................................................. 18

iii

C.  The Trial Court Abused Its Discretion In Prohibiting Defense Counsel From Arguing the Consequences Of Becoming a Sex Offender When Her Argument Was a Correct Statement Of the Law......................................................................... 19

D.  The Appellant Was Harmed By the Trial Court's Ruling, As the Jury Assessed Less Than the Maximum Punishment, Despite the State's Request To Do So To Protect the Community.................................................................................... 24

PRAYER............................................................................................................ 26

CERTIFICATE OF SERVICE ............................................................................. 27

CERTIFICATE OF COMPLIANCE ..................................................................... 28

# INDEX OF AUTHORITIES

**Cases**

*Corpus v. State*, 30 S.W.3d 35 (Tex. App.—Houston [14th Dist] 2000, pet. ref'd)…..........................................................................................17, 18, 21

*Dang v. State*, 154 S.W.3d 616 (Tex. Crim. App. 2005)..................................... 20

*Davis v. State*, 329 S.W.3d 798 (Tex. Crim. App. 2010) ................................... 16

*Johnson v. State*, 698 S.W.2d 154 (Tex. Crim. App. 1985) ............................... 17

*Jones v. State*, 725 S.W.2d 770 (Tex. App.—Dallas 1987, pet. ref'd) .............................. 22

*Lancaster v. State*, 772 S.W.2d 137 (Tex. App.—Tyler 1988, no pet.) ............................ 20

*Lemos v. State*, 130 S.W.3d 888 (Tex. App.—El Paso 2004, no pet.) ............................. 24

*Mays v. State*, 285 S.W.3d 884 (Tex. Crim. App. 2009)..................................... 16

*McGee v. State*, 774 S.W.2d 229 (Tex. Crim. App. 1989) .................................. 17

*Nzewi v. State*, 359 S.W.3d 829 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd)...16, 17, 19

*State v. Prestwood*, 711 S.E.2d 875, 2011 WL 1467627 (N.C. Ct. App. 2011) ........... 20, 21

*State v. Renteria*, 977 S.W.2d 606 (Tex. Crim. App. 1998) ......................................... 17, 21

*Turner v. State*, 87 S.W.3d 111 (Tex. Crim. App. 2002)..................................... 17

*Ward v. State*, 143 S.W.3d 271 (Tex. App.—Waco 2004, no pet.) ................................. 23

*Williams v. State*, 575 S.W.2d 30 (Tex. Crim. App. 1979) .................................. 24

**Statutes & Rules**

Tex. Code Crim. Proc. art. 37.07 .............................................................................. 21, 22

Tex. Code Crim. Proc. art. 42.12 ................................................................................ 23

Tex. Code Crim. Proc. art. 62.001 ........................................................................... 12, 18

Tex. Code Crim. Proc. art. 62.005 ............................................................................. 19

Tex. Code Crim. Proc. art. 62.051 ............................................................................. 18

Tex. Code Crim. Proc. art. 62.055 ............................................................................. 18

Tex. Code Crim. Proc. art. 62.101 ............................................................................. 18

Tex. Code Crim. Proc. art. 62.102 ........................................................................... 18, 25

Tex. R. App. Proc. Rule 33.1 ..................................................................................... 15

Tex. R. App. Proc. Rule 44.2 ..................................................................................... 24

Tex. Penal Code § 12.33 ........................................................................................ 19, 23

Tex. Penal Code § 12.35 ............................................................................................ 19

Tex. Penal Code § 22.011 ........................................................................................... 23

**Secondary Sources**

Op. Tex. Att'y Gen. No. GA-0056, 2003 WL 1849299 (2003) ...................................... 19

## STATEMENT OF THE CASE

The Harris County District Attorney's Office charged Roy Vasquez ("Appellant") by indictment on August 8, 2014, with one count of aggravated sexual assault. (C.R. at 7). Specifically, the Appellant was alleged to have placed his sexual organ in the complainant's anus and compelled the complainant to submit and participate by threatening to use force and violence, while exhibiting a knife (a deadly weapon). *Id.*

Voir dire began on February 9, 2015, and a twelve-person jury was empaneled on that same day. (3 R.R. at 130-136). Following a two-day trial on guilt-innocence, the jury returned a guilty verdict on the lesser-included offense of sexual assault. (5 R.R. at 121-122; C.R. at 134-135, 148). The punishment phase began immediately after the verdict was rendered, and the jury court assessed the Appellant's punishment at seventeen (17) years confinement in the Texas Department of Criminal Justice, along with a $10,000 fine. (7 R.R. at 28-30; C.R. at 147-148). A timely Notice of Appeal was filed by the Appellant and certified by the trial court on February 17, 2015. (C.R. at 151-153). No post-trial motions were filed.

## ISSUE PRESENTED

> **SOLE ISSUE:** The trial court erred in not permitting defense counsel to go into the requirements of sex offender registration during closing arguments during the punishment phase, and in doing so effectively denied the Appellant his right to counsel.

1

The complainant is a twenty-five year old female, who was twenty-two years old on the date of the incident. (4 R.R. at 13-14). On the morning of December 8, 2009, at about 6:00 a.m., the complainant awoke to someone entering her bedroom. She testified that she did not recognize this person—who was eventually identified as the Appellant—as someone that she knew, but recalled that they were a male wearing a jacket, blue shirt, and rosary. (4 R.R. at 18-19, 55-56, 58). As will be explained in more detail, accounts differ as to whether this person had consent to be in the complaint's house and as to what occurred between them, but it was uncontested that the Appellant had sexual contact with the complainant on December 8, 2009.

## A. The Complainant's Version Of Events

According to the complainant, the Appellant demanded money from the complainant, took her cell phone, grabbed her by the hair, and then told the complainant that she was pretty. At this point, the complainant testified that she felt a knife placed against her neck and that the Appellant instructed her to remove her clothes. (4 R.R. at 19-21). Even though she felt the knife, the complainant was not able to remember whether or not she had ever actually seen a knife at any point. (4 R.R. at 52, 57-58, 77-78, 82). When the complainant refused to remove her clothes, she claimed that the Appellant used the knife to rip off her shirt and then pulled off her pajama pants. (4 R.R. at 22, 24-25). The complainant then had her vaginal area penetrated by the Appellant's fingers, followed by having her anus penetrated by the Appellant's penis. (4

R.R. at 26-27). For about the next five minutes, the Appellant had sex with the complainant in this manner until he ejaculated onto her legs. (4 R.R. at 28-30, 73). In the complainant's version of events, the Appellant was not wearing a condom, although he had asked the complainant for one, which she handed to him, but that he did not use. (4 R.R. at 62).

The house's landline phone then began to ring and the Appellant instructed the complainant to answer it. On the other end of the line was the complainant's boyfriend and the complainant told him that she could not talk at the moment and that she would call him back. This was not done at the prompting of the Appellant and the complainant explained that "I did that on my own because I didn't know – I could barely talk." (4 R.R. at 31-33). The same scene played out a second time, as the complainant's boyfriend called back, the complainant told him that she could not talk, and then hung up the phone.[1] (4 R.R. at 34-35).

As the Appellant prepared to leave, he gathered up the Appellant's laptop computer, cell phone, and social security card. (4 R.R. at 35-36). The complainant told the Appellant that she had to go to school, otherwise people would come looking for her. In response, the Appellant instructed her to call whoever was supposed to pick

---

[1] The complainant's boyfriend from 2009, Isaac Ramirez, testified that he had called the complainant on the morning of December 9, 2009. Ramirez recounted that the complainant and he spoke on the phone that morning only one time for about fifteen seconds and that it sounded like "she didn't to want talk to me, but she did or she couldn't [sic]. I mean, I don't know. It was just weird." (5 R.R. at 88, 91).

3

her up. Following this instruction, the complainant called her sister and told her that she needed to be picked up. (4 R.R. at 36-37). The Appellant then walked out of the complainant's bedroom, and the complainant waited for a time before she got dressed and walked out of the bedroom as well. (4 R.R. at 37-38). The backdoor of the house had been left open and unlocked, so the complainant assumed that the Appellant had left. (4 R.R. at 39).

Rather than call 911, the complainant ran out of the house to a nearby school to try to find help. (4 R.R. at 39-40). A car passed by the complaint, who yelled at the driver to stop. When the driver stopped the car, the complainant told the driver what had happened and used the driver's cell phone to call 911. The complainant had never seen the driver before, did not know who it was, and has not seen the driver since then. (4 R.R. at 40). An ambulance, law enforcement, and the complainant's sister then began to arrive at the complainant's house a short time later. (4 R.R. at 41-42). The ambulance transported the complainant to Memorial Hospital where a rape kit examination was performed. (4 R.R. at 42).

Members of the Houston Police Department interviewed the complainant on two separate occasions and had her meet with an artist who created a sketch of the Appellant. (3 R.R. at 44-48; 8 R.R. at 5-6 (State's Exhibit 2)). Three years later in December 2012, the complainant tentatively identified the Appellant in a photo lineup presented to her by the police. (4 R.R. at 71).

4

## B. The Appellant's Version Of Events

The Appellant—who was seventeen years old at the time of the incident and twenty-two during the trial—took the stand in his own defense. (5 R.R. at 7). During his testimony, the Appellant admitted knowing the complainant and admitted that he had sex with her on the morning of December 8, 2009, in the complainant's bedroom, but that this encounter was entirely consensual and that he did not have a knife, nor did he make any threats. (5 R.R. at 22-23, 28-30, 35).

In the Appellant's version of events, he first encountered the complainant at the Broad Mini Mart convenience store near his home towards the end of October 2009. (5 R.R. at 8, 16). As the Appellant pulled his car into the store's parking lot, he saw the complainant getting out of her own car. (5 R.R. at 11). Alexis Godinez is the Appellant's friend and was with him during the trip to the convenience store in the passenger seat of the Appellant's car. (5 R.R. at 9-12). The Appellant told Godinez that he thought the complainant was pretty, and that he was going to attempt to go talk to her. After the Appellant approached the complainant, he complimented her by telling her she looked pretty, then asked if she had a boyfriend, to which the complainant replied that she did not. (5 R.R. at 11-13). The Appellant then asked the complainant for her phone number, but she instead asked to take the Appellant's phone number herself. The two then flirted with one another, made tentative plans to get together at some point, and then went their separate ways. (5 R.R. at 13-15).

5

Alexis Godinez—the passenger who was with the Appellant when he first encountered the complainant—testified at trial and largely confirmed the Appellant's rendition of events in the Broad Mini Mart parking lot. The relationship between Godinez and the Appellant has been a long one, as the two grew up together, but has always remained strictly platonic. (4 R.R. at 292). Godinez recognized the complainant's face from seeing her around the neighborhood, and recounted what occurred when the Appellant approached the complainant.(4 R.R. at 279-280). Once the Appellant saw the complainant in the parking lot, Godinez recalled that the Appellant announced that he was going to attempt to talk to her. With Godinez's encouragement, the Appellant approached the complainant. The two of them began speaking, and Godinez was close enough to them to hear most of their conversation. (4 R.R. at 285-287). From what Godinez could hear, the complainant was receptive to the Appellant's advances, and inquired about the Appellant's flashy car, complimented the Appellant's looks, and asked the Appellant if he made a lot of money. (4 R.R. at 287-288). As the two continued talking, Godinez heard the Appellant attempt to make plans with the complainant, who told the Appellant that she was looking to smoke some marijuana and have a good time. (4 R.R. at 288). The encounter ended when Godinez saw the Appellant give the complainant his telephone number. (5 R.R. at 289).

About a week-and-a-half after the Appellant and the complainant first met, the complainant called the Appellant. The two made arrangements to meet up with one

6

another at Brook Line Park near where they both lived. (5 R.R. at 16-17). The Appellant was driven to the park by his sister, Donna Vasquez, because his car needed repairs and was inoperable at the time. (4 R.R. at 307-309). When Donna Vasquez dropped off the Appellant, she saw him walk up to the complainant. (4 R.R. at 309-310).

When the Appellant met up with the complainant at the park, they sat down together at a bench in the park and spent some time talking and kissing. The Appellant had brought some marijuana to the park, which he began smoking, although the complainant did not want any for herself. (5 R.R. at 18-19). This entire encounter lasted about thirty-five to forty minutes before they left the park together on foot. The complainant's house was within walking distance of the park, and the Appellant walked her home, but did not go into her house on that night. *Id.*

The next encounter the Appellant had with the complainant was about a week later when he saw the complainant walking in the neighborhood as he was driving by. The Appellant stopped his car and offered to give her a ride, which she accepted and had the Appellant drop her off at her house. (5 R.R. at 20-22, 60). Godinez testified that she recalled seeing the Appellant driving his car with the complainant in it at some point, but was not able to say where they were going or what they were doing. (4 R.R. at 290).

Concerning the events at the center of the case, the Appellant testified that the complainant called him early in the morning on December 9, 2009, and invited him to

7

come over to her house. (5 R.R. at 23-24). Although the Appellant's car was available, it was blocked in by other cars and he elected to walk to the complainant's house, which was about twenty minutes away from where he lived by foot. (5 R.R. at 25-26, 61). Once he arrived at the complainant's house, the Appellant was allowed in the front door by the complainant who then took him to her bedroom. As the two started undressing and engaging in some "messing around," the house phone rang and the complainant answered it. The Appellant described the complainant as acting angry with the person on the other end of the line before she hung up the phone. (5 R.R. at 27-28, 64). From there, the complainant gave the Appellant a condom and the two started to attempt to have sex. The Appellant testified that although he initially attempted to penetrate the complainant's anus, he found it difficult, it made him uncomfortable, and it did not feel good. (5 R.R. at 28-30, 69-70). He therefore began to attempt to penetrate the complainant's vagina. But before the Appellant was able to do this, he ejaculated on the complainant's legs. (5 R.R. at 31-32, 71).

For the second time, the house phone rang, but the complainant did not answer it on this occasion as her and the Appellant were attempting to have sex. (5 R.R. at 30). After the Appellant ejaculated, someone started knocking on the front door of the complainant's house. The complainant told the Appellant that it was her boy-

friend[2] and that the Appellant needed to leave the house, which he did through the home's backdoor. (5 R.R. at 32-33).

When an officer came to the Appellant and asked for a buccal swab for a DNA sample, the Appellant voluntarily agreed to it and was shocked to learn the nature of the allegations against him. He agreed to cooperate with law enforcement's investigation. (5 R.R. at 40-41).

## C. Law Enforcement's Investigation Of the Incident

Officer Juan Carrillo with the Houston Police Department was the first member of law enforcement to respond to the complainant's 911 call at about 7:45 a.m. When he arrived, Carrillo saw the complainant outside the house and described her as appearing distraught. (4 R.R. at 94). On the left side of the complainant's neck, Carrillo saw what he described as a scratch. The size of the scratch lead Carrillo to believe that it was could have been inflicted by a fingernail. (4 R.R. at 97).

Inside of the house, Carrillo noted that the complainant's bedroom was in a state of disarray and found an unopened condom at the foot of the bed. (4 R.R. at 99-100). The rear door to the house had been left open and a glass window had been broken, both of which were found in the kitchen. (4 R.R. at 101-102). No pictures of either the window or the door were taken during the investigation. (4 R.R. at 113).

---

[2] Isaac Ramirez denied going to the complainant's house on December 9, 2009. (5 R.R. at 88-89).

9

Dana Oldham is the forensic nurse examiner at Memorial Hermann Hospital who conducted the sexual assault examination of the complainant on December 8, 2009. (4 R.R. at 123-124). Some thin superficial abrasions were found on the complainant's neck measuring 0.2 by 5 centimeters (or 0.07 by 1.9 inches in imperial units). (4 R.R. at 130-131, 133, 166-167). The complainant reported some tenderness on her left inner thigh. (4 R.R. at 136). Oldham elected not to conduct a speculum examination of the complainant's genitals, as no penetration of her vagina had been reported. However, some external injuries on the complainant's genitalia were discovered, including a 0.3 centimeter tear on her labia minora and a 0.7 centimeter tear on her anus, both of which she described as superficial. (4 R.R. at 136-138, 158-159). Swabs were taken of the complainant's anus, vagina, and lips. (4 R.R. at 141-142).

Officer Darcus Shorten is an investigator with the Houston Police Department and was assigned to do follow-up investigation in the complainant's case in late March of 2010. (4 R.R. at 169-173). Through the use of DNA evidence, Shorten identified the Appellant as a suspect. (4 R.R. at 173). A photospread featuring the Appellant was created by Shorten in October of 2012 and shown to the complainant in December of 2012. (4 R.R. at 174-177). Of the six pictures presented to her, the complainant identified two people—one of whom was the Appellant—as the person who had assaulted her. (4 R.R. at 180-181). With this identification, Shorten obtained a warrant for the Appellant's arrest. (4 R.R. at 182).

Priscilla Hill is a DNA analyst with the Harris County Institute of Forensic Sciences and conducted analysis of the genetic materials collected in the Appellant's case. (4 R.R. at 243). Hill concluded that the Appellant could not be excluded as a source of sperm found on swabs of the complainant. (4 R.R. at 260-264).

## SUMMARY OF THE ARGUMENT

The Appellant's sole point of error revolves around the punishment phase of his trial only. During closing arguments at the punishment phase, defense counsel sought to argue a correct and true statement of the law to the jury, but the State objected to this line of argument and the trial court sustained the objection. Specifically, defense counsel sought to argue that as a consequence of the Appellant's conviction for sexual assault, he would have to register for the rest of his life as a sex offender and would be subject to further criminal penalties if he failed to meet the registration requirements laid out in chapter 62 of the Code of Criminal Procedure.

Despite the fact that defense counsel's argument tracked the language of certain portions of chapter 62, the trial court ruled that there were no facts in evidence before the jury that would support this argument. But the trial court's ruling in sustaining this objection was error, as counsel is permitted to argue correct statements of the law before the jury that are relevant to the case, even if that law is not included in the jury charge. Although no Texas appellate court has apparently ruled before on this issue, at least one foreign jurisdiction court was held that under this exact scenario, a

11

defense attorney is entitled to inform the jury of the fact that a defendant will have to register as a sex offender as a consequence of a guilty verdict.

The punishment that the jury ultimately assessed was less the maximum sentence, despite the State's request for the jury to assess the maximum possible sentence. Harm to the Appellant is demonstrated here, as there is a reasonable possibility the jury would have assessed an even lower sentence had it been fully and fairly informed of the sex offender registration requirements that the Appellant was subject to as a result of his conviction.

## ARGUMENT

> **SOLE ISSUE:** The trial court erred in not permitting defense counsel to go into the requirements of sex offender registration during closing arguments during the punishment phase and in doing so effectively denied the Appellant his right to counsel.

There can be no doubt that as a consequence of his conviction in this case, the Appellant will be required to register as a sex offender for the rest of his life. *See* Tex. Code Crim. Proc. art. 62.001(5)(A) & (6)(A) (including sexual assault under the definition of a "reportable conviction or adjudication" and as a "sexually violent offense"); *see also* Tex. Code Crim. Proc. art. 62.101(a)(1) (requiring lifetime registration for offenders convicted of a sexually violent offense). The judgment in the Appellant's case notes that the sex offender registration requirements found in chapter 62 of the Texas Code of Criminal Procedure apply to him. (C.R. at 148). Despite the fact that lifetime sex offender registration was an automatic and immutable consequence of the Appel-

lant's conviction, the trial court sustained multiple objections from the State during defense counsel's closing argument in the punishment phase informing the jury of the sex offender registration requirements that the Appellant would face. (7 R.R. at 11-12). The trial court's ruling in this respect constituted reversible error.

### A. Error Is Preserved For Appellate Review, As the Appellant Reviewed an Adverse Ruling and Supplemented the Record With an Offer Of Proof

During defense counsel's closing argument to the jury in the punishment phase of trial, the following occurred near the end of defense counsel's argument to the jury:

| | |
|---|---|
| [Defense counsel]: | What does it mean to get convicted on a sexual assault case? What does it mean to Roy even before you assess punishment in this case? It means a lifetime of registration as a sexual offender, basically until the day he dies. Every time he moves houses, he will be required to register -- pre-register seven days before. |
| [The State]: | Objection, Your Honor. This is all facts not in evidence. |
| [Trial court]: | Sustained. Please stay within the evidence. |
| [Defense counsel]: | Sexual registration will also require -- |
| [The State]: | Objection, Your Honor, this is facts not in evidence. |
| [Trial court]: | Sustained. |

(7 R.R. at 11).

Defense counsel proceeded to move on to the remainder of her argument and concluded shortly thereafter. (7 R.R. at 14). However, after the jury began its punishment deliberations and before it returned its punishment verdict, defense counsel placed an offer of proof on the record. Before allowing defense counsel to make an

offer of proof, the trial court reiterated its position that "it is quite clear, the law says you're only allowed to argue to a jury facts that are in evidence and reasonable inferences there from." (7 R.R. at 22). It was the trial court's position that since there were no evidence or witnesses who delivered testimony concerning sex offender registration requirements that there was "not any shred of evidence that was presented that allows you to argue that." (7 R.R. at 23). But the trial court did acknowledge that "I'm not saying what you were going to say is not true. You're right. They do have to register as a sex offender." *Id.*

In her offer of proof, defense counsel articulated what her closing argument would have consisted of had the trial court not sustained the State's objection in the two instances quoted above. Specifically, defense counsel would have argued the following:

> [Defense counsel]: Being a sex offender essentially means lifetime registration, basically until the day he dies. Every time he moves residences, he would be required to register. Before he moves – seven days before he moves and seven days after the move. If he were to go somewhere for two days in three months, he has to report to the authorities of that city and county as well. And failure to comply with the registration requirements is another felony. And depending on the circumstances of that particular case, the range of punishment can be anywhere between 180 days to 20 years in prison for each violation.
>
> Once he registers, the police will automatically be provided with his sex offender status upon request when they run a check on his driver's license or his license plate.

14

> Additionally, the Texas Attorney General's Office authorizes local governments to broadcast information about registration of sex offenders to local cable television news because it's public information. His name will also be on the Internet as a registered sex offender.

(7 R.R. at 24-25).

At the conclusion of defense counsel's offer of proof, the trial court again stated its position that this argument was not allowed and explain its logic thusly:

[Trial court]: All right. And again, I heard absolutely zero evidence of any of that information presented to this jury to allow them to consider that. And in my mind this -- allowing the defense to be able to say those things with no evidence being presented is almost -- even though all that may well be true, is almost the same thing as allowing the State to get up then and even though they did not present evidence of prior juvenile adjudications, which was given notice of, or misconduct in the hail, which they didn't present any evidence of -- to get up and say oh, yeah, by the way, he had all of this stuff, which is probably true. It's the same thing --

(7 R.R. at 25).

Because the State made an objection during closing arguments, stated the grounds it was basing its objection on, and the trial court ruled on the State's objection, error has been preserved for appellate review. It is also apparent from the trial court's comments on the record that it understood the nature of the State's objection and agreed with the legal reasoning presented by the State. *See* Tex. R. App. Proc. 33.1(a). Additionally, because defense counsel made an offer of proof as to what her

argument would have consisted of had the trial court overruled the State's objection, the record contains sufficient information to allow this Court to determine whether the trial court's exclusion of this argument was erroneous and harmful. *Mays v. State*, 285 S.W.3d 884, 890 (Tex. Crim. App. 2009) (quoting 1 Steven Goode, et al., 1 *Texas Practice Series: Guide to the Texas Rules of Evidence* § 103.3 (2d ed. 1993)).

## B. Counsel Is Entitled To Argue Correct Statements Of Law To the Jury And Sexual Assault Requires Lifetime Registration As a Sex Offender

When reviewing a trial court's ruling on objections made during the course of arguments to the jury, an abuse of discretion standard is applied. *See Davis v. State*, 329 S.W.3d 798, 825 (Tex. Crim. App. 2010). However, when the objected to argument concerns whether a party misstated the law during the jury argument, appellate courts review *de novo* whether the law was presented correctly. *Nzewi v. State*, 359 S.W.3d 829, 841 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd). Thus, there are two layers of review that must be employed. First, this Court must determine whether the trial court abused its discretion in sustaining the State's arguing facts not in evidence objection. And second, whether the argument defense counsel proffered was a misstatement of the law.

### a. Arguments to the jury may contain correct statements of the law, even if the argued law is not included in the jury charge

As a general matter, the trial court has broad discretion in controlling the scope of closing arguments, but a trial court may not prevent defense counsel from making

16

a point essential to the defense. *Nzewi,* 359 S.W.3d at 841. The improper denial of a jury argument may constitute a denial of the right to counsel if the jury argument is one the defendant is entitled to make. *McGee v. State*, 774 S.W.2d 229, 238 (Tex. Crim. App. 1989); *see also Johnson v. State*, 698 S.W.2d 154, 166 (Tex. Crim. App. 1985). But no party is entitled to argue an incorrect statement of law before the jury. *Id.*

The Court of Criminal Appeals has "long held that 'error in jury argument does not lie in going beyond the court's charge, but in stating law contrary to the same.' That is, there is no error in correctly arguing the law, even if the law is not included in the court's charge." *State v. Renteria*, 977 S.W.2d 606, 608 (Tex. Crim. App. 1998) (*quoting Mauldin v. State*, 628 S.W.2d 793, 795 (Tex. Crim. App. 1982)); *see also Turner v. State*, 87 S.W.3d 111, 117-18 (Tex. Crim. App. 2002) (holding that prosecutor's argument to the jury that they were to consider defendant's self-defense claim from the viewpoint of an "ordinary and prudent person" and not from the standpoint of a "psychopath or a sociopath" was permissible as it did not misstate self-defense law). Thus, in *Corpus v. State*, 30 S.W.3d 35 (Tex. App.—Houston [14th Dist] 2000, pet. ref'd), the State could properly assert in closing arguments that two people could possess a weapon per the law of parties, although no law of parties charge was included in the jury charge. Much like the present case, defense counsel in *Corpus* objected that this argument was outside the facts and outside the charge, but the trial court overruled this objection. On appellate review, the Fourteenth Court of Appeals held that the State

was entitled to argue matters of law before the jury so long as the law was correctly stated, even if the legal issue was not submitted to the jury in its charge. *Id.* at 41-42.

### b. A conviction for sexual assault requires lifetime registration as a sex offender

Chapter 62 of the Texas Code of Criminal Procedure governs the registration of sex offenders. Because sexual assault is a reportable conviction, the requirements of Chapter 62 became applicable to the Appellant following his conviction in the guilt-innocence phase of trial. Tex. Code Crim. Proc. art. 62.001(5)(A). Further, the Appellant was subject to lifetime registration as a sex offender, as sexual assault is categorized as a sexually violent offense. Tex. Code Crim. Proc. art. 62.001(6)(A) & 62.101(a)(1).

When a person required to register as a sex offender moves residences, they are required to register and confirm their new address within seven days with local law enforcement. Tex. Code Crim. Proc. art. 62.051(a). Similarly, law enforcement must be notified seven days in advance when a required registrant intends to change his address. Tex. Code Crim. Proc. art. 62.055(a).

The failure to comply with any of the mandatory registration requirements embodied in Chapter 62 ranges anywhere from a state jail felony to a second degree felony for a first offense. Tex. Code Crim. Proc. art. 62.102(b). The maximum penalty for a state jail felony is up to 180 days confinement, while the maximum penalty for a

second degree felony is up to 20 years confinement. Tex. Penal Code §§ 12.33 & 12.35.

The Texas Department of Public Safety is required to publicly post on a website a sex offender's picture and vital information. Tex. Code Crim. Proc. art. 62.005(c). Additionally, a sex offender's registration is tied to any licenses—professional or otherwise—he may carry. Tex. Code Crim. Proc. art. 62.005(e, f, g). When any peace officer looks up a sex offender's driver's license number or a licenses plate tied to a car the registrant owns, all information relating to the registrant's status as sex offender becomes immediately available to the peace officer. Tex. Code Crim. Proc. art. 62.006. All information regarding a sex offender's registration—with certain limited exceptions, such as social security number—is public information and may be broadcast on television. Tex. Code Crim. Proc. art. 62.005(a); *see also* Op. Tex. Att'y Gen. No. GA-0056, 2003 WL 1849299 (2003).

While the above information may seem axiomatic, it is important to note that these statutes track the language of the closing argument that defense counsel was prohibited from delivering, as outlined by defense counsel's offer of proof. (7 R.R. at 24-25).

## C. The Trial Court Abused Its Discretion In Prohibiting Defense Counsel From Arguing the Consequences Of Becoming a Sex Offender When Her Argument Was a Correct Statement Of the Law

The argument proffered by defense counsel in her offer of proof was a correct statement of the law regulating the registration of sex offenders as prescribed in

19

Chapter 62 of the Texas Code of Criminal Procedure. (7 R.R. at 24-25). And although a trial court has broad discretion to control closing arguments to the jury, this discretion is not completely unfettered. *Nzewi*, 359 S.W.3d at 841. For example, it is error for a trial court to not permit defense counsel to show a videotape during closing arguments which had earlier been admitted into evidence by the State. *Lancaster v. State*, 772 S.W.2d 137, 139-40 (Tex. App.—Tyler 1988, no pet.). Likewise, a trial court may not exercise its broad discretion in presiding over arguments before the jury to limit the amount of time permitted for argument to an unreasonably short amount of time. *Dang v. State*, 154 S.W.3d 616, 622 (Tex. Crim. App. 2005). The Appellant would now ask this court to hold that it is an abuse of the trial court's discretion to control the scope of closing arguments when a trial court does not permit counsel to argue a correct statement of law before the jury that is applicable to the case, bit which is not contained in the jury charge. A review of Texas case law has not uncovered a case where this issue has been previously addressed, apparently making this an issue of first impression. However, at least one foreign jurisdiction appellate court has addressed this exact issue and held that such an argument was permissible.

In the North Carolina case of *State v. Prestwood*, 711 S.E.2d 875, 2011 WL 1467627 (N.C. Ct. App. 2011), an analogous situation presented itself. In *Prestwood*, the defendant was charged with three counts of sexual battery and defense counsel attempted to inform the jury during closing arguments that the defendant would be required to register as a sex offender if he was convicted. *Id.* at *3. The prosecution

20

objected to this line of argument, which the trial court sustained. On appellate review, the North Carolina Court of Appeals held "the defendant's trial counsel had the right to inform the jury of the consequences of a conviction for sexual battery, including the mandatory registration requirements, and it was error for the trial court to sustain the State's objection." *Id.* The appellate court's decision was based on North Carolina case law that had previously held that counsel is permitted to "read or state to the jury a statute or other rule of law relevant to such case, including the statutory provision fixing the punishment for the offense charged." *Id.* (*quoting State v. Britt*, 204 S.E.2d 817, 829 (N.C. 1974)). The precedent relied on by the North Carolina Court of Appeals in *Prestwood* is comparable to the Texas rule that a closing argument may contain a correct statement of the law, even if it is not included in the jury charge. *Renteria*, 977 S.W.2d at 608; *Corpus*, 30 S.W.3d at 41-42. Ultimately, the North Carolina Court of Appeals held that the trial court's erroneous ruling was harmless, as there was overwhelming evidence against the defendant. But nevertheless, the trial court's limitation of defense counsel's closing argument regarding sex offender registration was in error. *Prestwood*, 2011 WL 1467627, at * 3-4.

A comparison can be drawn between the facts of the present case and cases that have addressed the use by the State of parole laws in closing arguments at punishment. It must be noted initially that there is a statutory prohibition on the jury's consideration of parole laws in assessing punishment. *See* Tex. Code Crim. Proc. art. 37.07 § 4 (providing that the jury should be instructed that they are not to consider

21

the extent to which good conduct time may be awarded to or forfeited by a particular defendant or the manner in which the parole laws may be applied to a particular defendant). Any jury argument that encourages the jury to ignore this statutory instruction and consider parole laws is undoubtedly impermissible. *See Jones v. State*, 725 S.W.2d 770, 772 (Tex. App.—Dallas 1987, pet. ref'd) (holding that prosecutor's argument to the jury to act contrary to the prohibition on considering parole law in assessing punishment "was error, was manifestly improper, and was so prejudicial that even had an objection been raised, an instruction to disregard would not have cured the error").

However, no similar statutory prohibition exists against informing juries that someone convicted of a reportable sexual offense will have to register as a sex offender, or of what the other statutorily prescribed consequences of registration entail. The presence of a statute specifically preventing the jury from considering parole laws would indicate that but for this statute, such an argument would otherwise be permissible as it would constitute a correct statement of the law.

Put simply, it is inconsequential whether or not there was evidence presented during the punishment phase of the Appellant's newfound requirement to register as a sex offender, or the other registration requirements that the Appellant would be subject to. The trial court's ruling in sustaining the State's objection to defense counsel's argument would be akin to not allowing counsel to argue for a suggested term of confinement in prison on the grounds that no evidence was presented at the punishment

phase that there are any prisons in Texas, despite the fact that confinement in prison is a statutorily prescribed consequence of the Appellant's conviction. *See* Tex. Penal Code §§ 12.33(a) & 22.011(f) (punishing sexual assault as a second degree felony and setting the punishment range for a second degree felony at 2 to 20 years "imprisonment in the Texas Department of Criminal Justice"). The Appellant's duty to register a sex offender as a consequence of his conviction was a *fait accompli* in the same way that his guaranteed imprisonment was once the jury rendered a guilty verdict for sexual assault.[3]

Because defense counsel was entitled to make an argument to the jury that consisted of a correct statement of the law—even if that law was not contained in the jury charge—and because defense counsel's proffered argument was a correct statement of the law, the trial court abused its discretion in sustaining the State's objection and prohibiting defense counsel from continuing her proffered closing argument.

---

[3] No Motion for Community Supervision was filed in the Appellant's case. But even if such a motion had been filed, the Appellant was not eligible for community supervision due to his prior felony convictions, which the Appellant stipulated to. (C.R. at 106-17; 6 R.R. at 6, 8-11). *See* Tex. Code Crim. Proc. art. 42.12 § 4(d)(3) & (e); *Ward v. State*, 143 S.W.3d 271, 275 (Tex. App.—Waco 2004, no pet.) ("[W]e conclude that a defendant must prove by a preponderance of the evidence that he or she has no prior felony convictions to be eligible for community supervision."). This necessarily means that the Appellant would have to be sentenced to a term of imprisonment as a consequence of his conviction.

**D. The Appellant Was Harmed By the Trial Court's Ruling, As the Jury Assessed Less Than the Maximum Punishment, Despite the State's Request To Do So To Protect the Community**

Because the improper denial of a jury argument which defense counsel is entitled to make served to deny the Appellant his right to counsel, this error rises to the level of constitutional error and must be evaluated for harm under Texas Rules of Appellate Procedure 44.2(a). *See Lemos v. State*, 130 S.W.3d 888, 892-93 (Tex. App.—El Paso 2004, no pet.) (holding trial court's error in preventing defense counsel from arguing a legitimate inference form the evidence was harmful under Rule 44.2(a)'s constitutional error standard; also noted that improper argument by a prosecutor would be evaluated under Rule 44.2(b)'s harmless error standard, as such a situation did not constitute denial of a defendant's right to counsel). Under this standard, reversal is required "unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." Tex. R. App. Proc. 44.2(a).

In her closing argument to the jury, the prosecutor for the Sate made a plea for law enforcement in that she urged the jury to sentence the Appellant to the maximum possible punishment "for your community." (7 R.R. at 21). While it has long been the case that such arguments in closings are permissible, *Williams v. State*, 575 S.W.2d 30, 33-34 (Tex. Crim. App. 1979) ("It is a proper argument that a sentence ought to deter crime and therefore protect the community."), the trial court's ruling prevented the jury from knowing that the sex offender registration requirements the Appellant was subject to would act as a further protection for the community. As defense counsel

24

would have informed the jury, the Appellant would constantly be under the threat of a second degree felony if he failed to comply with the sex offender registration requirements. (7 R.R. at 24); Tex. Code Crim. Proc. art. 62.102(b). This left the jury with the false impression that the only way it could protect the community was to sentence the Appellant to a lengthy prison term.

"A defendant is entitled to be convicted upon a correct statement of the law." *Hutch v. State*, 922 S.W.2d 166, 174 (Tex. Crim. App. 1996). In this case, the trial court prevented the Appellant from having his punishment assessed upon a full and correct statement of the law. Because the jury assessed less than the maximum amount of imprisonment that could have been levied on the Appellant—despite the State's request that the jury assess the maximum punishment of 20 years, (7 R.R. at 21-22)— there is a reasonable doubt that had the jury been informed of the sex offender registration requirements the Appellant would be subject to, they would have assessed an even lower punishment.

## PRAYER

Roy Vasquez asks this Honorable Court to reverse the jury's assessment of punishment for the offense of sexual assault and remand the case to the trial court for a new proceeding on punishment only.

Respectfully submitted,

**ALEXANDER BUNIN**
Chief Public Defender
Harris County, Texas


/s Mark Kratovil
**MARK KRATOVIL**
Assistant Public Defender
Texas Bar Number 24076098
1201 Franklin Street, 13th Floor
Houston, Texas 77002
Telephone:  (713) 274-6728
Facsimile:   (713) 437-4339
mark.kratovil@pdo.hctx.net

## CERTIFICATE OF SERVICE

I certify that I provided a copy of the foregoing brief to the Harris County District Attorney's appellate division by electronic delivery through eFile Texas on July 31, 2015.

/s Mark Kratovil
**MARK KRATOVIL**

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 9.4(i)(3), undersigned counsel certifies that this brief complies with the type-volume limitations of Tex. R. App. Proc. 9.4(e)(i).

1.      Exclusive of the portions exempted by Tex. R. App. Proc. 9.4 (i)(1), this brief contains **6,510** words printed in a proportionally spaced typeface.

2.      This brief is printed in a proportionally spaced typeface using Garamond 14 point font in text and Garamond 12 point font in footnotes.

3.      Upon request, undersigned counsel will provide an electronic version of this brief and/or a copy of the word printout to the Court.

4.      Undersigned counsel understands that a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in Tex. R. App. Proc. 9.4(j), may result in the Court's striking this brief and imposing sanctions against the person who signed it.

/s Mark Kratovil
**MARK KRATOVIL**