# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-14-00228-CR
NO. 03-14-00229-CR

**Troy Luther Williams, Appellant**

**v.**

**The State of Texas, Appellee**

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT
NOS. D-1-DC-12-904077 & D-1-DC-12-904080
HONORABLE CLIFFORD A. BROWN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

In two causes consolidated for trial, a jury convicted appellant Troy Luther Williams of the offenses of aggravated kidnapping and aggravated sexual assault.[1] The jury assessed punishment at 60 years' imprisonment for the aggravated-kidnapping offense and 85 years' imprisonment for the aggravated-sexual-assault offense. The district court rendered judgment on each verdict. In three points of error on appeal, Williams asserts that (1) the evidence is insufficient to prove that he committed the offense of aggravated sexual assault; (2) the district court erred in failing to instruct the jury on the defense of "voluntary release in a safe place," which, when proven, mitigates the punishment for the offense of aggravated kidnapping; and (3) the district court abused

---

[1] *See* Tex. Penal Code §§ 20.04 (aggravated kidnapping), 22.021 (aggravated sexual assault).

its discretion in overruling Williams's objection to the prosecutor's argument regarding parole law. We will affirm the judgments of conviction.

## BACKGROUND

The jury heard evidence that on the morning of March 8, 2012, S.D., a 66-year-old woman, was walking along a trail located at the Gus Garcia Recreation Center ("the Center") in Northeast Austin when she was approached from behind by a man. S.D. testified that the man passed her and then "turned back" around and came "right up against [her], almost touching [her]." At that point, S.D. recounted, she noticed that "his pants were unzipped and his penis was completely out." S.D. told the man to "zip up [his] pants and we'll go on our way" and "nobody will get in any trouble." S.D. then "stepped back enough to go behind him and headed back toward[] the [Center] across the field," but, S.D. explained, she "was grabbed from behind and was being very rapidly dragged down the trail towards the woods." S.D. testified that a struggled ensued, with the man "trying to pull [her] pants down [as she] was trying to hold them up, and [they] fought like that for quite a while." Eventually, S.D. testified, the man succeeded in pulling down her pants and underwear. S.D. then screamed out for help, but the man covered her mouth with his hand, and told her to stop yelling. When she did so, S.D. recalled, she "realized that his penis was thrusting very hard against [her] vagina," which prompted her to resume screaming. According to S.D., the man eventually stopped thrusting, told her that he was "done," and announced that he was going to kill her. At that point, S.D. got up from off the ground, pulled up her pants and underwear, and noticed that her car keys were missing. Assuming that the man had taken them from her pants pocket, S.D. then "started trying to negotiate," telling the man, "[I]f you give me back my keys, I can go to

2

Walmart and get some clean clothes so I can go on to work and nobody will know anything about this." S.D. testified that the man told her in response, "I'm from New Orleans, I've got two felonies already and it won't matter if I kill you." S.D. then started walking away from the trail and toward the Center, while the man "walked along beside" and "followed" her. Eventually, S.D. recounted, the two of them reached the door of the Center, where S.D. again asked the man to "leave the keys" on the ground and told him that "nothing is going to happen." According to S.D., the man "put [the keys] on the ground" and "turned around to leave again." S.D. then attempted to open the door, but it was locked, so she "tapped" on the door, hoping that someone inside would hear her. Instead, the man heard her tapping, and, according to S.D., "he turned around and he said, you lied, you lied to me, you were going to tell, and ran back and got the keys which were still on the ground. And then I just started banging on the door and he went to my car."

S.D. further testified that she then ran away from the Center while the man tried, unsuccessfully, to drive away in her car (according to S.D., "he got the car started, but he was grinding the gears"). The man eventually called out to S.D., asking her to help him "get this thing in gear or something like that." Not wanting the man to escape, and thinking that she could "stall" him until other people arrived, S.D. returned to the car, began talking to the man, pulled the car keys from the ignition, and ran away again. S.D. testified that the man chased after her and "pushed [her] from the side," which caused her to drop the keys. The man then "grabbed the keys and ran back to the car," while S.D. ran across the street to the parking lot of a middle school. There, S.D. explained, she encountered a school employee in his truck, used his phone to call the police, and then waited at the truck until police arrived. As she was waiting, S.D. observed the man get out of her car and walk away from the Center. That same morning, according to the evidence presented, a

3

man matching the description of S.D.'s assailant, later identified as Williams, was located and apprehended by officers with the Austin Police Department.

S.D. testified that, as a result of the assault, she "had cuts and bruises all over [her] body and some burning from [her] vagina." She was taken to a hospital, where she underwent a sexual-assault examination. Julie Gibbs, the sexual-assault nurse examiner (SANE) who had performed the examination, testified that S.D. had multiple lacerations on her face, broken blood vessels on her back, and bruises and abrasions on various parts of her body. Gibbs also observed injuries to S.D.'s vaginal area. Specifically, Gibbs testified that S.D.'s urethra "had a red and irritated appearance" and that her perineum had "two small abrasions," or breaks in the skin. Gibbs also "noted a few red areas on the cervix, and then a little bit of blood that was there." Sperm samples were also obtained from S.D.'s vaginal area during the exam. The DNA analyst who tested the samples, Sapana Pajapati, testified that Williams was excluded as a contributor to the sperm that was found on the vaginal swabs but could not be excluded from the sperm that was found on the labial swab. According to Pajapati, "The DNA profile from the sperm fraction of the labial swab is consistent with the DNA profile of Troy Williams." In other words, Pajapati explained, Williams's sperm was found on S.D.'s labia.

Based on this and other evidence, which we discuss in more detail below as it is relevant to Williams's points of error, the jury found Williams guilty of both charged offenses and assessed punishment as noted above. The district court rendered judgment on each verdict. These appeals followed.

4

## ANALYSIS

**Sufficiency of the evidence**

In his first point of error, Williams asserts that the evidence is insufficient to prove that he committed the offense of aggravated sexual assault. Specifically, he claims that the evidence is insufficient to prove that he penetrated the victim.

When reviewing the sufficiency of the evidence to support a conviction, we consider all of the evidence admitted in the light most favorable to the verdict to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt.[2] We must consider all the evidence in the record, whether direct or circumstantial or properly or improperly admitted.[3] We assume that the jury resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict, and we defer to the jury's determinations of the witnesses' credibility and the weight to be given their testimony.[4]

A person commits the offense of aggravated sexual assault if he intentionally or knowingly causes the penetration of the anus or sexual organ of another person by any means, without that person's consent, and commits one of several aggravating factors during the commission of the assault.[5] The only element of the offense that Williams challenges on appeal is penetration.

---

[2] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

[3] *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

[4] *Jackson*, 443 U.S. at 318-19; *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010); *Clayton*, 235 S.W.3d at 778; *see* Tex. Code Crim. Proc. art. 38.04.

[5] *See* Tex. Penal Code § 22.021.

Penetration is not defined in the penal code, but the Court of Criminal Appeals has explained that "'in common parlance, mere contact with the outside of an object does not amount to a penetration of it.'"[6] However, "'pushing aside and reaching beneath a natural fold of skin into an area of the body not usually exposed to view, even in nakedness, is a significant intrusion beyond mere external contact. Consequently, . . so long as contact with [the victim's sexual organ] could reasonably be regarded . . . as more intrusive than contact with her outer vaginal lips,'" penetration occurs.[7] This element of the offense "is satisfied by showing any penetration, no matter how slight."[8] Moreover, the statute "does not require penetration of the vagina, but rather criminalizes the broader conduct of penetration of the 'female sexual organ.'"[9] Accordingly, "[p]enetration between the labia of the female's private parts by the male sexual organ of the defendant is sufficient although the vagina was not entered or an act of intercourse was never completed."[10]

In arguing that S.D. was not penetrated, Williams focuses on evidence in the record tending to show that S.D. did not believe, after the assault had occurred, that Williams had "penetrated" her. Specifically, in multiple statements to the police, S.D. had told officers that no penetration had occurred. Also, during her testimony, S.D. explained that "from what [she]

---

[6] *Green v. State*, __ S.W.3d ___, 2015 Tex. Crim. App. LEXIS 1405, at *16 (Tex. Crim. App. Dec. 16, 2015) (quoting *Vernon v. State*, 841 S.W.2d 407, 409 (Tex. Crim. App. 1992)).

[7] *Id*. (quoting *Vernon*, 841 S.W.2d at 409-10).

[8] *Sherbert v. State*, 531 S.W.2d 636, 637 (Tex. Crim. App. 1976); *Murphy v. State*, 4 S.W.3d 926, 929 (Tex. App.—Waco 1999, pet. ref'd); *see also Vizcarra v. State*, No. 03-08-00189-CR, 2008 Tex. App. LEXIS 7491, at *17-18 (Tex. App.—Austin Aug. 28, 2008, no pet.) (mem. op., not designated for publication).

[9] *Villa v. State*, 417 S.W.3d 455, 461 (Tex. Crim. App. 2013).

[10] *Sherbert*, 531 S.W.2d at 637.

was aware of there wasn't completed intercourse and ejaculation." Williams also emphasizes the evidence tending to show that his DNA was not found on the sperm that was recovered from S.D.'s vagina. As for the evidence tending to show that his DNA was found on the sperm that was recovered from S.D.'s labia, Williams claims that he could have ejaculated on S.D.'s legs and that the sperm might have been transferred from her legs to her genital area when she pulled up her pants.

Although the above evidence could support a finding that Williams did not penetrate S.D., there is other evidence in the record that supports the jury's finding to the contrary. Specifically, S.D. testified that Williams pulled her pants down during the assault and that his "penis was thrusting very hard against [her] vagina." She later added on cross-examination that his "erect penis was banging against" and "pushing against" her vagina. Moreover, S.D. also testified that she felt "some burning" in her vaginal area following the assault, and the results of the SANE exam tended to show that she had injuries to her vaginal area, including abrasions on her perineum, redness and irritation on her urethra, and irritation and some bleeding in her cervix. Also, the evidence tending to show that Williams's sperm was found on S.D.'s labia, although not conclusive proof of penetration, nevertheless supports the jury's finding that penetration occurred, particularly when considered in connection with the other evidence summarized above. Viewing this evidence in the light most favorable to the verdict, we conclude that it is sufficient to prove that Williams's contact with S.D.'s sexual organ was "more intrusive than contact with her outer vaginal lips."[11]

We overrule Williams's first point of error.

---

[11] *See, e.g.*, *Villa*, 417 S.W.3d at 462; *Steadman v. State*, 280 S.W.3d 242, 247-48 (Tex. Crim. App. 2009); *Vernon*, 841 S.W.2d at 409-10; *Sherbert*, 531 S.W.2d at 637.

**Jury instruction on "voluntary release in a safe place"**

The punishment level for aggravated kidnapping is reduced from a first-degree felony to a second-degree felony if the kidnapper "voluntarily releases the victim in a safe place."[12] Williams requested a jury instruction on that issue in the court's charge on punishment, and the district court denied his request. In his second point of error, Williams asserts that the district court erred in failing to instruct the jury on that issue.

The district court shall provide the jury with "a written charge distinctly setting forth the law applicable to the case"[13] The law applicable to the case includes "statutory defenses, affirmative defenses, and justifications whenever they are raised by the evidence."[14] "[A] defense is supported (or raised) by the evidence if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true."[15]

"[W]e do not apply the usual rule of appellate deference to trial court rulings when reviewing a trial court's decision to deny a requested defensive instruction."[16] Instead, "we view the evidence in the light most favorable to the defendant's requested submission."[17] A defendant

---

[12] *See* Tex. Penal Code § 20.04(c), (d).

[13] Tex. Code Crim. Proc. art. 36.14.

[14] *Walters v. State*, 247 S.W.3d 204, 208-09 (Tex. Crim. App. 2007).

[15] *Shaw v. State*, 243 S.W.3d 647, 658-59 (Tex. Crim. App. 2007); *see* Tex. Penal Code § 2.03(c) ("The issue of the existence of a defense is not submitted to the jury unless evidence is admitted supporting the defense.").

[16] *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006).

[17] *Id.*

8

is entitled to a jury instruction on a defensive issue if it is raised by the evidence, regardless of the strength or credibility of that evidence.[18] On the other hand, if the evidence, viewed in the light most favorable to the defendant, does not establish the defense, an instruction on that defense is not required.[19]

To raise the issue of "voluntary release in a safe place," there must be evidence that the kidnapper actually "released" the victim, that the kidnapper released the victim "voluntarily," and that the kidnapper released the victim in a "safe place."[20] For there to be a "release," there must be evidence that the kidnapper "'performed some overt and affirmative act that brings home to the victim that he/she has been fully released from captivity.'"[21] For the release to be "voluntary," there must be evidence that the release was not the result of intervention or action by others, such as rescue by the police or escape by the victim.[22] Finally, there must be evidence from which a rational jury could reasonably infer that the location of the release was "safe" under the circumstances, such as evidence relating to (1) the remoteness of the location, (2) the proximity of help, (3) the time of day,

---

[18] *See Farmer v. State*, 411 S.W.3d 901, 906 (Tex. Crim. App. 2013) (citing *Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999)).

[19] *See id*.

[20] *See Butcher v. State*, 454 S.W.3d 13, 19 (Tex. Crim. App. 2015); *Ballard v. State*, 193 S.W.3d 916, 919 (Tex. Crim. App. 2006); *Brown v. State*, 98 S.W.3d 180, 183-88 (Tex. Crim. App. 2003); *West v. State*, 406 S.W.3d 748, 766 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

[21] *Ex parte Chandler*, 182 S.W.3d 350, 355 n.18 (Tex. Crim. App. 2005) (quoting *Wiley v. State*, 820 S.W.2d 401, 411 (Tex. App.—Beaumont 1991, no pet.)); *see Harrell v. State*, 65 S.W.3d 768, 772 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd).

[22] *See Ballard*, 193 S.W.3d at 919; *Brown*, 98 S.W.3d at 188; *LaHood v. State*, 171 S.W.3d 613, 624-25 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd); *Oestrick v. State*, 939 S.W.2d 232, 238-39 (Tex. App.—Austin 1997, pet. ref'd).

(4) the climate, (5) the condition of the complainant, (6) the character of the location and surrounding neighborhood, and (7) the complainant's familiarity with the location or neighborhood.[23]

Viewed in the light most favorable to Williams, the evidence summarized above does not establish that Williams ever "voluntarily released" S.D. Instead, the evidence shows that, after Williams assaulted S.D., he "walked beside" her and "followed" her to the Center. And, once there, Williams did not give S.D. her car keys and inform her that she was free to leave. Rather, he placed her car keys on the ground and turned around. But, as soon as he heard S.D. knock on the door of the Center in an attempt to get help, he told her that she had lied to him, picked up the keys, and ran to her car. Then, as S.D. tried to run away from the Center, Williams called out to her and told her to come to the car and help him start the engine. When S.D. returned to her car, she grabbed the car keys from the ignition and ran away. Williams then chased her, pushed her, grabbed the keys, and ran back to her car. There is no evidence in the record from which a reasonable fact-finder could infer that, during this sequence of events, Williams performed an "overt and affirmative act that [brought] home to the victim that she has been fully released from captivity." At most, the above evidence tends to show that Williams allowed S.D. to escape while he tried to get away in her car, which does not constitute a "voluntary release" as that term has been defined by Texas courts.[24]

---

[23] *See Butcher*, 454 S.W.3d at 19-20; *West*, 406 S.W.3d at 766-67.

[24] *See, e.g.*, *Ballard*, 193 S.W.3d at 919; *Brown*, 98 S.W.3d at 188; *Dominguez v. State*, 467 S.W.3d 521, 527-28 (Tex. App.—San Antonio 2015, pet. ref'd); *West*, 406 S.W.3d at 766-67; *LaHood*, 171 S.W.3d at 624-25; *Carreon v. State*, 63 S.W.3d 37, 39-40 (Tex. App.—Texarkana 2001, pet. ref'd); *Hernandez v. State*, 10 S.W.3d 812, 822 (Tex. App.—Beaumont 2000, pet. ref'd); *Oestrick*, 939 S.W.2d at 239.

Accordingly, on this record, we cannot conclude that the district court erred in denying Williams an instruction on the issue.

We overrule Williams's second point of error.

**Jury argument**

During the punishment phase of trial, the prosecutor made the following closing argument regarding parole:

> What this charge is telling you is, when you go back there you can't say, I wonder when he'll be paroled. What you do know and what the law provides is that he has to serve at least half of the term before he is eligible for parole. And, ladies and gentlemen, you cannot consider the eligibility, if he is actually going to get paroled. Okay? That is not something that you need to be talking about. What we do know and as an example, let's say you gave a 50-year sentence, he would be eligible for parole—

At that point, Williams objected on the ground that the prosecutor was instructing the jury on how to apply parole rules to Williams's sentence. The district court overruled the objection but admonished the jury that "what the lawyers are arguing is not evidence" and that "the law is the charge that is given to you and you will be guided by the charge." The prosecutor then resumed her argument as follows:

> So what the law provides and what the charge says is that the defendant will not become eligible until he serves at least half of whatever sentence is assessed. So, for example, if it was a 50-year sentence, he would not be eligible until 25 years. If it's a 60-year sentence, he is not eligible until 30 years. If it's 60 to life, there's still that same 30 years. Okay? So he—if you assess a life sentence, then he is still eligible at 30 years.

11

In his third point of error, Williams asserts that this was an improper jury argument and that the district court should have sustained his objection to it.

We review a trial court's ruling on an objection to improper jury argument for abuse of discretion.[25] A trial court abuses its discretion when it acts arbitrarily or unreasonably, without reference to any guiding rules and principles.[26]

Proper jury argument generally falls within one of four areas: (1) summation of the evidence, (2) reasonable deductions from the evidence, (3) answers to an argument of opposing counsel, and (4) pleas for law enforcement.[27] Additionally, it is well settled that proper jury argument may also include restating, paraphrasing, and explaining the instructions contained in the court's charge.[28]

Here, the court's charge included the following instructions regarding parole:

It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.

---

[25] *See Davis v. State*, 329 S.W.3d 798, 825 (Tex. Crim. App. 2010); *Nzewi v. State*, 359 S.W.3d 829, 841 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd).

[26] *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005); *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990).

[27] *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008); *Alejandro v. State*, 493 S.W.2d 230, 231 (Tex. Crim. App. 1973).

[28] *See, e.g.*, *Hawkins v. State*, 135 S.W.3d 72, 84 (Tex. Crim. App. 2004); *Whiting v. State*, 797 S.W.2d 45, 48 (Tex. Crim. App. 1990); *Jones v. State*, 641 S.W.2d 545, 550 (Tex. Crim. App. 1982); *Campbell v. State*, 492 S.W.2d 956, 957-58 (Tex. Crim. App. 1973); *Spencer v. State*, 460 S.W.3d 180, 185-86 (Tex. App.—Eastland 2015, pet. ref'd); *Orsag v. State*, 312 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd).

Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one-half of the sentence imposed, without consideration of any good conduct time he may earn. If the defendant is sentenced to a term of less than four years, he must serve at least two years before he is eligible for parole.

Eligibility for parole does not guarantee that parole will be granted.

It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.[29]

In *Taylor v. State*, the Court of Criminal Appeals held that when the charge contains the above instructions regarding parole, it is proper for the prosecutor to explain "how the parole eligibility rules set out in the charge work" with various sentences.[30] In *Taylor*, the prosecutor made nearly identical arguments to the arguments made by the prosecutor in this case.[31] In concluding that the arguments were proper, the Court of Criminal Appeals observed that the prosecutor's arguments "did not convey any information beyond what was properly contained in the charge."[32] Instead, "[t]he

---

[29] These instructions track the statutory language regarding parole law. *See* Tex. Code Crim. Proc. art. 37.07, § 4(a).

[30] 233 S.W.3d 356, 359 (Tex. Crim. App. 2007).

[31] The prosecutor's arguments in *Taylor* included the following: "[a] 40-year sentence means the defendant becomes eligible for parole after serving 20 years"; "[a] 60-year sentence means he becomes eligible after serving 30 years"; "[a] sentence of life or 75 still means he becomes eligible after 30 years." 233 S.W.3d at 358.

[32] *Id*. at 359.

13

explanation simply ensured that the jury understood the language set out in the instructions."[33] The high court concluded that nothing in the record "indicates that the prosecutor's explanations went beyond an attempt to clarify the meaning of the jury instructions."[34] Following *Taylor*, we reach the same conclusion here. On this record, we cannot conclude that the district court abused its discretion in overruling Williams's objection to the prosecutor's arguments regarding parole.[35]

We overrule Williams's third point of error.

## CONCLUSION

We affirm the judgment of conviction in each cause.

_____

Bob Pemberton, Justice

Before Chief Justice Rose, Justices Pemberton and Field

Affirmed

Filed:  January 27, 2016

Do Not Publish

---

[33] *Id*.

[34] *Id*.

[35] *See id*.; *Spencer*, 460 S.W.3d at 186-87; *Waters v. State*, 330 S.W.3d 368, 372-75 (Tex. App.—Fort Worth 2010, pet. ref'd); *see also Castillo v. State*, No. 03-08-00190-CR, 2009 Tex. App. LEXIS 5470, at *9-13 (Tex. App.—Austin July 17, 2009, no pet.) (mem. op., not designated for publication).